# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SIMON-MILLS II, LLC, ARUNDEL MILLS MEZZANINE GP, L.L.C., GRAPEVINE MILLS OPERATING COMPANY, L.L.C., CONCORD MILLS MALL GP, L.L.C., KATY MILLS MALL GP, L.L.C., COLORADO RETAIL DEVELOPMENT COMPANY, L.L.C., and DENVER WEST DEVELOPMENT COMPANY, LLC, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs / Counterclaim Defendants, | ) ) ) ) |
| v. | ) C.A. No. 8520-VCG ) |
| KAN AM USA XVI LIMITED PARTNERSHIP, KAN AM USA XII LIMITED PARTNERSHIP, KAN AM USA XIV LIMITED PARTNERSHIP, KAN AM USA XIX LIMITED PARTNERSHIP, KAN AM USA XVIII LIMITED PARTNERSHIP, KAN AM USA TIER II LIMITED PARTNERSHIP, KAN AM USA XV LIMITED PARTNERSHIP, KAN AM USA XX LIMITED PARTNERSHIP, and KAN AM USA XVII LIMITED PARTNERSHIP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants / Counterclaim Plaintiffs. | ) ) |

## MEMORANDUM OPINION

Date Submitted: December 16, 2016
Date Decided: March 30, 2017

Donald J. Wolfe, Jr., Matthew E. Fischer, Timothy R. Dudderar, Berton W. Ashman, Jr., Matthew F. Davis, J. Matthew Belger, Jacqueline A. Rogers, Elizabeth H. Mellon, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Plaintiffs.*

Jon E. Abramczyk, Matthew R. Clark, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: L. Joseph Loveland, Letitia A. McDonald, Emily Shoemaker Newton, J. Andrew Pratt, of KING & SPALDING LLP, Atlanta, Georgia, *Attorneys for Defendants.*

GLASSCOCK, Vice Chancellor

This post-trial Memorandum Opinion involves interpretation of a series of contracts. The case presents a cautionary tale of strategic silence, or more charitably incomplete contractual terms, in structuring and negotiating complex economic relationships among sophisticated investors. This litigation arises from a series of Joint Venture Agreements (the "JV Agreements"), the parties to which include the Plaintiffs (collectively "Simon" or the "Simon Entities") and the Defendants (collectively "KanAm" or the "KanAm Entities"). The JV Agreements permit Simon to purchase KanAm's interests, at a time and for a price set out in the Agreements. The parties dispute the consideration that must be tendered in order for the Plaintiffs to exercise this call provision. The contract requires that consideration be paid in units of a specific partnership, Mills Partnership, but Mills Partnership, and its units ("Mills Units"), are defunct. The issue is whether the Plaintiffs' inability to tender Mills Units gives the Defendants an effective veto power over the contractual call provision. That is, can the Defendants insist on receiving non-existent units under the contractual language, and thus frustrate exercise of the call? Or, in the alternative, can the Plaintiffs pursuant to the contracts and Delaware law effectively tender units *similar* to Mills Units, and thereby compel the Defendants to sell under terms to which it did not agree?

The parties could have, but failed to, address this situation in the contractual language. My task, now, is to apply the contracts the parties did agree to, consistent

1

with their intent as expressed in those contracts. The difficulty with this task is exacerbated in that the obligations seeking to be enforced under the JV Agreements arise out of several different contracts, negotiated at various times going back to the 1990's, with several different contractual parties involved.

At first blush, this situation seems to call for an application of the implied covenant of good faith and fair dealing, which is inherent in every contact. The implied covenant is inapplicable here, however. Instead, it is my view, developed through the trial record, that the parties engaged in a strategic game of musical chairs, dancing around the contractual silence in the hope that the music would stop at a period of time advantageous to their own purposes. The music has stopped.

I examined this matter on cross motions for summary judgment, and reached the conclusion in *Simon I*[1] that a full record was necessary to answer the questions presented here. The contractual language is clear; under the conditions here, the Plaintiffs had the right to call the Defendants' interest in the joint ventures, but unless the Defendants chose to accept cash, the Plaintiffs could only complete the transactions by tendering contractually-compliant consideration, which here (with a single exception) meant Mills Units. Those units were unavailable to the Plaintiffs from the time it acquired the joint ventures. Thus, although the contract was not

---

[1] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2014 WL 4840443 (Del. Ch. Sept. 30, 2014).

ambiguous, I required a record to examine whether the parties had a meeting of the minds that some other consideration could be tendered, or, conversely, as to whether the call right would be rendered nugatory. The parties have created such a plenary record.

The Plaintiffs seek relief on several grounds. First, they argue that a contractual agreement was reached, as demonstrated by the record, that units of the Plaintiffs' entity ("Simon Units") replaced Mills Units as tender. I read the record otherwise. The record makes it abundantly clear that both the Plaintiffs and the Defendants were aware that, once the Plaintiffs absorbed and dissolved the Mills Partnership, contractually-compliant Mills Units would become permanently unavailable. Rather than solve this issue by negotiation, however, both sides, for what must have been strategic reasons, elected to take their chances with the contracts as written rather than solve the obvious problem through negotiation. Having made that choice, the Plaintiffs are stuck with the contractual language, as it exists.

Next, the Plaintiffs argue that Simon Units are similar to Mills Units, and thus, in tendering Simon Units, they have not "materially breached" the contracts. But such an analysis itself is inapt. Under the contracts, the notice of exercise of the call

3

right is conditioned on an ability to tender the appropriate consideration.[2]  Since the Plaintiffs are unable to do so, their notices are voidable under the contracts at issue, and KanAm has no obligation to perform.  In other words, failure to tender Mills Units is not a "breach," it simply renders the call ineffective.  In any event, while the Simon Units have many characteristics identical to compliant Mills Units, they have differences as well.  The extent of these differences, and the consequences thereof to the Defendants, should have been the subject of the negotiation that the parties eschewed.

Finally, as already briefly discussed, the Plaintiffs ask me to supply a term to the contract—substituting Simon Units for Mills Units—under the implied covenant of good faith and fair dealing.  But the implied covenant exists to supply terms that were not anticipated and not considered by the parties, to avoid frustration of the intent of those parties.  As I have stated, the parties were well aware of the issue, but declined to address it; the implied covenant is therefore inapplicable.

For all these reasons, the Plaintiffs' request to enforce its call right is denied.

The Defendants, via counterclaim, seek damages.  They note that the Plaintiffs, through attempting these calls, triggered contractual duties on the part of

---

[2] *See, e.g.*, JX0152 § 11.6(e)(iv) (providing that "if at the time of Closing, either party *fails to perform as required*, then and in such event the non-breaching party *shall have the right to void the Buy/Sell Notice attributable thereto* **or** to pursue any rights at law or in equity (including without limitation, instituting a suit for specific performance)") (emphasis added).

4

the Defendants, which were expensive to comply with. They seek to recover these expenses, and allege that the unsuccessful call notices breached the parties' agreements. In giving contractual notice of the exercise of the call, the Plaintiffs did not breach the Agreements. The Plaintiffs had the right to call, the Defendants had the right to elect cash or Mills Units. The Defendants elected units; the Plaintiffs are unable to tender, but this does not itself amount to a breach.

I have found that the call rights in the JV Agreements require tender of Mills Units. One JV Agreement in particular tends to prove the rule. In the Orange City Mills Agreement (but no other JV Agreement), the parties defined "Mills" in such a way as to include its successor, Simon, and Simon Units are eligible to be contractually-compliant consideration. With respect to Orange City Mills, the Plaintiffs may have effectively called the Defendants' interest. The Plaintiffs argue that this fact shows the parties must have intended their units to be acceptable tender in the other agreements as well; to me, in light of the fact that the parties to the Orange City Mills venture provided for Mills' successor units to function as tender, the lack of such a provision in all other joint ventures demonstrates the opposite.

I note that construing the contracts as written does not work a forfeiture of a primary interest or destroy value here. The Plaintiffs cannot force the Defendants to sell their interests for appraised value, but they may negotiate for a sale, or proceed as they have as joint venturers.

5

My reasoning follows.

## I. FACTUAL BACKGROUND

The following are the facts as I find them following a seven-day trial spanning over nine hundred exhibits. Below I first describe the necessary background information underlying this dispute, including importantly the evolution of the parties' relationship, before turning to my findings regarding what the extrinsic evidence at trial showed.

*A. The Parties and Relevant Non-parties*[3]

The Plaintiffs (and Counterclaim Defendants), the Simon Entities, are a series of Delaware limited liability companies focused on retail shopping developments. They are Simon-Mills II, LLC, Arundel Mills Mezzanine GP, L.L.C., Grapevine Mills Operating Company, L.L.C., Concord Mills Mall GP, L.L.C., Katy Mills Mall GP, L.L.C., Colorado Retail Development Company, L.L.C., and Denver West Development Company, LLC. Each Plaintiff is wholly owned, either directly or indirectly, by Simon Property Group, L.P. (the "Simon Partnership").[4] The Simon Partnership "owns, develops, and manages retail real estate properties."[5]

The sole general partner of the Simon Partnership is a real estate investment trust ("REIT"), structured as an umbrella partnership real estate investment trust

---

[3] Unless the context requires a more specific designation, the Plaintiffs will be referred to as Simon, and the Defendants as KanAm.
[4] Pretrial Stip. 2, 6 (May 4, 2016).
[5] *Id.* at 6.

("UPREIT"), the Simon Property Group, Inc. ("Simon Corp").[6] In addition to being the sole general partner of the Simon Partnership, all of Simon Corp's "assets are owned, directly or indirectly, by its operating partnership, Simon Partnership."[7] Simon Corp, however, owns a majority interest in Simon Partnership.[8] Common stock of Simon Corp trades on the New York Stock Exchange ("NYSE").[9]

The Defendants (and Counterclaim Plaintiffs), the KanAm Entities, are a series of nine "closed-end funds, structured as Delaware limited partnerships, with German investors as limited partners."[10] They are, Kan Am USA XVI Limited Partnership, Kan Am USA XII Limited Partnership, Kan Am USA XIV Limited Partnership, Kan Am USA XIX Limited Partnership, Kan Am USA XVIII Limited Partnership, Kan Am USA Tier II Limited Partnership, Kan Am USA XV Limited Partnership, Kan Am USA XX Limited Partnership, and Kan Am USA XVII Limited Partnership.[11] The Defendants are an investment vehicle for German investors to deploy capital in American-based retail-store development projects.[12] The KanAm Entities' investments in America have been managed by James Braithwaite and Kent Hammond since the 1980's.[13]

---

[6] *Id.* at 7.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 2.
[12] *See* Trial Tr. 845:6–846:8 (Braithwaite).
[13] *See id.* at 649:16–650:12 (Braithwaite); *id*. at 938:10–939:21 (Hammond).

7

The parties have stipulated that Simon and KanAm hold interests in the following projects at issue here: Orange City Mills Mezzanine II Limited Partnership ("Orange City Mills"), Arundel Mills Mezzanine Limited Partnership ("Arundel Mills"), Grapevine Mills Limited Partnership ("Grapevine Mills"), Concord Mills Mall Limited Partnership ("Concord Mills"), Katy Mills Mall Limited Partnership ("Katy Mills"), Mills-Kan Am Colorado Limited Partnership ("Colorado Mills"), and Mills-Kan Am Denver West, L.P. ("Denver West") (collectively the "JV Limited Partnerships").[14] All of the JV Limited Partnerships are "a limited partnership organized under the laws of the state of Delaware. Each of the JV Limited Partnerships is governed by a limited partnership agreement" (the "JV Agreements").[15]

Non-party The Mills Limited Partnership (the "Mills Partnership")[16] and the Mills Corporation ("Mills Corp" and together with "Mills Partnership," "Mills") were also real estate investment vehicles.[17] Mills Corp was a REIT "based in Chevy Chase, Maryland, which developed, owned, and managed retail real estate properties."[18] Mills Corp, like Simon Corp, was structured as an UPREIT.[19] Mills

---

[14] Pretrial Stip. 9.
[15] *Id.*
[16] Sometimes referred to in the original text of documents as "TMLP."
[17] Unless context requires a more specific designation Mills Partnership and Mills Corp will simply be referred to as "Mills."
[18] Pretrial Stip. 8.
[19] *Id.*

Partnership served as the operating partnership and "directly or indirectly owned all of Mills" Corp's assets.[20] Mills Corp served as the general partner to, and the majority owner of Mills Partnership.[21] Mills Corp's "stock formerly traded on the NYSE."[22] As discussed below, Mills was acquired and ultimately dissolved by a joint venture of Simon and an unrelated third-party in 2007.

*B. The Evolution of the Parties' Relationship*

1. Mills Corp's IPO

In the mid-1980's KanAm together with the Western Development Corporation ("Western") started developing four "Mills" complexes (not at issue here) which were envisioned and marketed as a new shopping experience.[23] This shopping "experience" has been referred to as the "Mills Concept" which consisted of "race track" style retail spaces where pedestrians would come and shop "like walking down a street."[24] The Mills Concept shopping experience was styled to include a variety of price points for shoppers and a "larger entertainment component than you would typically find in a mall."[25] "Between 1983 and 1991, certain Kan

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *See* Trial Tr. 839:7–839:22 (Braithwaite); JX0004 at 5, 8, 13 (advertising certain "Mills" as "The Next Generation of Retailing").
[24] *See* Trial Tr. 842:20–843:20 (Braithwaite); *id.* at 844:1–844:10 (Braithwaite).
[25] *See id.* at 467:18–468:17 (Sokolov).

9

Am limited partnerships provided [Western] with more than $210 million in equity to finance projects, including the first four 'Mills' shopping centers. . . ."[26]

The four "Mills Concept" properties that KanAm and Western developed were contributed to the Mills Partnership at the time of Mills Corp's 1994 IPO.[27] KanAm held approximately 41% of the outstanding partnership units of the Mills Partnership at the time of the Mills Corp IPO.[28] Mills Corp held a 51.3% interest in the Mills Partnership at the time of the IPO.[29] Additionally, three principals of KanAm served as directors of Mills Corp from its inception through its financial problems in the mid-2000's, and ultimate dissolution: James Braithwaite, Franz von Perfall, and Dietrich von Boetticher.[30] Following the 1994 IPO, the Mills Corp Board and its shareholders approved a proposal in early 1995 that set out a framework whereby KanAm could contribute equity to certain projects going forward as joint ventures with Mills Corp (the "Shareholder Resolution").[31] Mills Corp Chairman and CEO, Herbert Miller, indicated that KanAm "was a likely party

---

[26] Pretrial Stip. 7. The four original "Mills" shopping centers, none of which are at issue in this litigation are Potomac Mills, Franklin Mills, Sawgrass Mills, and Gurnee Mills. *See id.*

[27] Trial Tr. 839:19–840:14 (Braithwaite); JX0004 at 8–9. *See* Pretrial Stip. 7–8 ("In 1994, Western Development and certain Kan Am limited partnerships jointly contributed the four Mills centers and other projects to The Mills Limited Partnership . . . in conjunction with the creation and formation of the Mills Corporation . . . , which went public in an IPO.").

[28] JX0004 at 21.

[29] *Id.*

[30] Trial Tr. 854:6–16 (Braithwaite).

[31] *See* JX0011 at 10–11; Pretrial Stip. 9.

to supply some of the required capital" due to the then "17-year relationship" between Mills Corp and its predecessors, and KanAm.[32]

## 2. The Early JV Agreements

The February 16, 1995 Shareholder Resolution of Mills Corp, discussed above, provided the "general terms" governing the future Joint Ventures ("JVs") between Mills affiliates and KanAm.[33] Among various other provisions,[34] the "general terms" provided certain exit mechanisms including that each partner would have "a right of first refusal to purchase the other's interest."[35] Importantly, the solicitation for the Shareholder Resolution provided the consideration for the put and call rights would include units of the Mills Partnership and stated that:

> either partner will have the right to require the purchase by [Mills Partnership] of [KanAm's] interest in the Partnership after the end of the fifth anniversary of the substantial completion of the Project . . . at a price to be determined by the amount [KanAm] would receive if the Project were sold at its appraised value. . . . The purchase price for [KanAm's] interest may be paid for in any combination of cash or [Mills Units] *as agreed to by the parties.*[36]

The solicitation indicated that KanAm would "have significant consent rights . . . which could, in certain cases, prevent [the Mills Partnership] from selling a project when it wished or operating a project exactly as it desired . . . ."[37] Mills Corp

---

[32] *See* JX0011 at 1–2.
[33] Pretrial Stip. 9.
[34] Not discussed in detail here as they are less relevant to this litigation.
[35] JX0011 at 12.
[36] *Id.* (emphasis added).
[37] *Id.* at 13.

11

explained that the consents were acceptable because they were not greater than what similar investors would require, that the parties' interests were "generally" aligned, and that if the consent rights became a problem, KanAm could be bought out for "appraised value once the project is mature."[38]

The consideration required for the put/call of KanAm's interest was to "be paid for in any combination of cash or [Mills Units] *as agreed to by the parties*."[39] Mills Corp was structured as an UPREIT, and the limited partnership units of the operating partnership, Mills Partnership, were redeemable and could be converted into publicly traded stock of Mills Corp.[40] This consideration structure had benefits in addition to liquidity; it would permit KanAm to secure non-recognition tax treatment pursuant to Internal Revenue Code Section 721.[41]

In September 1995, KanAm and Mills signed a JV Agreement for Ontario Mills (not at issue here).[42] Prior to execution of that JV Agreement, Simon and Mills executed an agreement on August 16, 1995, providing the "principal terms and conditions" for "proposed joint venture" arrangements regarding certain future projects.[43] This marked the beginning of Simon's involvement in Mills projects. KanAm and Mills added Simon as a partner to the Ontario Mills JV in December

---

[38] *Id.*
[39] *Id.* at 12 (emphasis added).
[40] *See* Trial Tr. 15:8–17:12 (Simon).
[41] *See, e.g.*, *id.* at 941:3–9 (Hammond).
[42] *See* JX0017.
[43] *See* JX0014 at 1; Pretrial Stip. 9.

1995 following the execution of the original agreement between Mills and KanAm.[44] This was the first JV including Simon, Mills, *and* KanAm.[45]

The September 1995 Ontario Mills agreement between Mills and KanAm provided a buy/sell provision consistent with the February 1995 Mills' Shareholder Resolution. Section 11.3 of the Ontario Mills JV Agreement, titled "Buy/Sell Arrangements of KanAm Partnership Interests" provided that after the project has been open for five years,[46] Mills or KanAm could trigger the buy/sell provisions.[47] If Mills exercised the call, KanAm "shall be paid in full in units of limited partnership in [the Mills Partnership] *unless* KanAm elects to receive cash."[48] If KanAm exercised its put the consideration was to be paid in cash, unless Mills elected to pay in Mills Units.[49] Further, the original agreement provided that if KanAm were to receive Mills Units, those units "shall have the same rights (including redemption, conversion, registration and anti-dilution protection) as attached to Units issued in connection with the formation transactions of [the Mills Partnership]."[50] Among other things, this provides that the units would be liquid and convey tax benefits.

---

[44] *See* JX0025.
[45] *See* Trial Tr. 163:23–164:3 (Barkley).
[46] JX0017 § 11.3(a).
[47] *Id.* at §§ 11.3(b), 11.3(c).
[48] *Id.* at § 11.3(d) (emphasis added).
[49] *Id.*
[50] *Id.* at § 11.3(f).

13

The Ontario Mills agreement was amended on December 29, 1995, to add Simon as a partner.[51] Upon Simon joining Ontario Mills, the ownership break down was as follows: 50% by Mills, 25% by Simon, and 25% by KanAm.[52] The amendment changed the buy/sell provision's consideration clause to provide that if Mills exercised the call, "unless KanAm[] elects to receive cash, the Buy/Sell Price shall be paid in full as follow: two-thirds (2/3) in units of limited partnership in [the Mills Partnership] and one-third (1/3) in units of limited partnership in Simon."[53] The amendment added a provision to protect KanAm regarding Simon Units, similar to that regarding Mills Units in the original agreement. Any Simon Units tendered to KanAm were required to have "the same rights" as units issued in connection with the formation of Simon.[54] Additionally, the provision governing the buy/sell requirements was amended to add that any such exchange of units was "intended to be a tax-free transaction" under Section 721.[55]

From the late 1990's to early 2000's Simon reviewed each investment opportunity and elected *not* to participate in the development of three of the other projects at issue in this litigation: Katy Mills, Colorado Mills, and Orange City Mills.[56] That is, Mills and certain KanAm parties formed Orange City Mills in 1996,

---

[51] *See* JX0025.
[52] *See* Trial Tr. 374:3–19 (Foxworthy).
[53] JX0025 § 11.3(d).
[54] *Id.* at § 11.3(f).
[55] *Id.* at § 11.3(d).
[56] *See* JX0041; JX0050; JX0089.

14

Katy Mills in 1998, and Colorado Mills in 2001.[57]  Simon eschewed initial investment; as discussed below, Simon's interests in these three projects arose later, in 2007, as a result of its acquisition of Mills.  The buy/sell provisions of these projects—Orange City Mills, Katy Mills, and Colorado Mills—never referenced Simon Units.

Simon did, however, together with Mills and KanAm, participate in three other JVs at issue here from their inception: Grapevine Mills, Concord Mills, and Arundel Mills.[58]  Each of these projects consisted of two separate agreements; first, an LLC agreement between the Mills Partnership and the Simon Partnership governing their relationship (a "Simon-Mills LLC"),[59] and second, a JV Agreement where a Simon-Mills LLC was the managing general partner, and the applicable KanAm party was a general and limited partner, while the Mills Partnership and the Simon Partnership were also limited partners.[60]

Generally, the JV Agreements in Concord Mills, Grapevine Mills, and Arundel Mills tracked the amended JV Agreement for Ontario Mills providing KanAm call-right consideration in both Simon and Mills Units.[61]  There were, however, certain differences regarding the buy/sell provisions.  Specifically, the

---

[57] Pretrial Stip. 10.
[58] *See* JX0027; JX0058; JX0071.
[59] *See, e.g.*, JX0082; JX0063.
[60] *See* JX0027; JX0058; JX0071.
[61] *See, e.g.*, Trial Tr. 680:5–11 (Braithwaite); *id.* at 942:24–943:7 (Hammond).

three later agreements provided a ten-year lock-out period instead of the five-year period provided for in Ontario Mills.[62] Additionally, the buy/sell consideration provisions were somewhat different from that in Ontario Mills. First, rather than the specified two-thirds, one-third unit consideration set out in the Ontario Mills JV, the new agreements provided that unit consideration would be paid "ratably in proportion to the ownership interests" based on Simon and the Mills Partnership's respective ownership interest.[63] Consideration paid in Units remained the default in the event of a call, but KanAm continued to have the option to elect to be paid in cash.[64] Additionally, KanAm contracted for the right to receive consideration partially in cash, and partially in units.[65] Thus, implicitly, at the time these deals were struck, in case Mills was bought out by Simon, and then Simon called the KanAm interest, KanAm had bargained to accept, in that case, only Simon Units as non-cash consideration.

If the buy/sell consideration for KanAm's interest in Concord, Arundel or Grapevine Mills was to be paid in units, those Simon Units and Mills Units were required to meet specific requirements.[66] As with the agreement governing Ontario

---

[62] JX0027 § 11.3(a); JX0058 § 11.3(a); JX0074 § 11.3(a).
[63] JX0027 § 11.3(d); JX0058 § 11.3(d); JX0074 § 11.3(d). I note there is evidence in the record that the parties had at one time planned to amend the Ontario Mills JV to change the fixed percentage provision to a proportional buy/sell consideration like those in Concord, Grapevine and Arundel Mills. *See* JX0024 at 3.
[64] *See* JX0027 § 11.3(d); JX0058 § 11.3(d); JX0074 § 11.3(d).
[65] *See id.*
[66] JX0027 § 11.3(f); JX0058 § 11.3(f); JX0074 § 11.3(f).

16

Mills, Mills Units were required to have "substantially the same rights (including redemption, conversion, registration and anti-dilution protection) as" units issued by the Mills Partnership at its initial formation.[67] Simon Units had to meet a similar requirement but had the additional condition that "[i]f there exists more than one class of Simon Units, then any Simon Units received by [KanAm] pursuant to this Section 11.3 *shall have the most favorable rights* (including redemption, conversion, registration and anti-dilution protection) as are attached, as of the date of this Agreement, to the various classes of Simon Units issued to other limited partners of Simon . . . ."[68] I note that the JV Agreements were later amended to allow KanAm to accelerate its put rights, that is, exercise them prior to the ten-year lockout, in the event of a change-in-control transaction involving Mills.[69] A similar change for the call right was made in the Grapevine Mills agreement, but *not* in the agreements covering the other JVs.[70]

Simon points to prospectuses KanAm disseminated during this time period to German investors from whom KanAm sought to raise capital for each of these JVs.[71] Those prospectuses do not disclose any particular distinction between Mills Units

---

[67] *See, e.g.*, JX0027 § 11.3(f).
[68] *See, e.g.*, *id.* (emphasis added).
[69] *Compare* JX0071 §§ 1.13, 11.3(a) *with* JX0058 § 11.3(a). *See* Trial Tr. 873:6–874:8 (Braithwaite).
[70] *See* JX0109.
[71] *See* Simon's Post-Trial Opening Br. 17 (citing JX0031; JX0037; JX0060; JX0070).

and Simon Units, such as tax risks.[72]  Additionally, two prospectuses in the record make no mention of the currency to be used in the buy/sell transactions,[73] and the two that do mention the buy/sell currency do not mention Simon Units.[74]

### 3. The 2002 "Shotgun" Exit

By 2002, disputes arose between Simon and Mills regarding the management of their JVs.[75]  The applicable LLC Agreements that governed Mills' and Simon's relationship in Ontario, Grapevine, Concord, and Arundel Mills contained a "shotgun" buy/sell mechanism which could be invoked to cure deadlocks.[76] Pursuant to the shotgun buy/sell provision, the party that triggered the shotgun was required to make an offer to the counterparty—the counterparty then either had a choice to buy at that price or sell at that price.[77]  Simon triggered the shotgun buy/sell provision, and Mills ultimately elected to purchase Simon's interests.[78]

However, before Mills bought Simon's interest, Braithwaite of KanAm wrote a letter to Simon's CEO, David Simon, on March 4, 2002 inquiring about the Ontario Mills buy/sell provision in Section 11.3 of the JV Agreement.[79]  Specifically, Braithwaite indicated KanAm "would be interested in discussing with [Simon] how

---

[72] *See* JX0031; JX0037; JX0060; JX0070.  *See also* Trial Tr. 726:22–727:13 (Braithwaite).
[73] *See* JX0031; JX0037.
[74] *See* JX0060 at 32; JX0070 at 44.
[75] Trial Tr. 386:1–387:11 (Foxworthy).
[76] *See id.*
[77] *See id.* at 387:12–388:11 (Foxworthy).
[78] *See id.* at 17:20–18:22 (Simon).
[79] *See* JX0099 at 2.

Section 11.3 of the Ontario Mills Agreement might be implemented if there has been a buy/sell between Mills and Simon of your interests in Ontario Mills, L.L.C."[80] David Simon responded via letter on March 5, 2002, stating that following the removal of either Simon or Mills, KanAm's rights under the Ontario Mills agreement would be to receive the appropriate units "of whichever of Mills or Simon [remained] your partner."[81] There was no direct objection by Braithwaite or KanAm to Simon's explanation of what Section 11.3 would mean following the shotgun buy/sell.[82] Braithwaite testified that even though he disagreed with Mr. Simon's position in the letter at the time, he did not respond.[83] According to Braithwaite, there was "no point" in taking issue with Simon's statement because he 'knew' that Simon would be bought out.[84] The record tends to support Braithwaite's position that the response was unnecessary, as the general consensus at the time was that Mills would buy out Simon.[85]

---

[80] *Id.*

[81] JX0100 at 1.

[82] *See* Trial Tr. 23:20–24:13 (Simon).

[83] *See id.* at 732:22–737:13 (Braithwaite).

[84] *See id.*

[85] *See, e.g.*, *id.* at 389:4–23 (Foxworthy) (testifying that while Simon was willing to buy, and that it was possible they might have to be the buyer, "[w]e expected—I would have to say we expected to be the seller because for them to have lost the four assets that we were dealing with would have been a terrible infringement of their franchise"); JX0101 (indicating in a March 7, 2002, internal Mills Memorandum, which Braithwaite received, that Mills would continue negotiating in pursuing the acquisition and that the "benefits of such a transaction are numerous").

19

On April 29, 2002, affiliates of Simon executed an agreement to sell their interests in Ontario, Grapevine, Concord, and Arundel Mills to affiliates of Mills.[86] Shortly thereafter in 2002, certain KanAm entities acquired part of Simon's former interests in Ontario, Grapevine, Concord, and Arundel Mills from Mills following its successful purchase of Simon's interests.[87]

Following Simon's exit from the four JVs, Mills and KanAm amended the governing documents, to remove references to Simon.[88] On May 31, 2002, the operative Ontario Mills JV agreement, a project not at issue here, was amended to delete references to Simon.[89] Also on May 31, 2002, the Grapevine Mills JV Agreement was amended to delete references to Simon.[90] On November 22, 2002, KanAm and Mills entered a new partnership agreement for Concord Mills.[91] In the resulting agreement for Concord Mills, Section 11.3's buy/sell provision only references Mills Units, and provides that they are the default consideration if Mills exercised its call right, unless KanAm elected to receive cash or a mix of cash and units.[92] Additionally, the Arundel Mills JV underwent similar changes. On May 31, 2002, the JV Agreement was amended to remove references to Simon.[93] A new

---

[86] JX0104; Pretrial Stip. 10.
[87] Pretrial Stip. 10. *See* JX0111.
[88] *See, e.g.*, JX0111 § 9(f).
[89] *See* JX0108 §§ 2(e), 10.
[90] *See* JX0109 §§ 2(e), 13.
[91] *See* JX0120.
[92] *Compare* JX0120 §§ 11.3(d), 11.3(f) *with* JX0058 §§ 11.3(d), 11.3(f).
[93] *See* JX0106 §§ 2(e), 15.

partnership document was executed for Arundel Mills on August 4, 2004, and like the new partnership agreement in Concord Mills, provided that Mills Units were the default buy/sell consideration, and contained no reference to Simon Units.[94] Thus, either through deletion of references to Simon, or via new partnership agreements which do not provide for Simon Units, the default consideration for the buy/sell provisions under each JV was modified to provide that consideration be paid in Mills Units meeting certain specifications. While Simon admits Mills and KanAm acted to delete references to it from the JV Agreements from which it exited, Simon argues the amendments were "ministerial."[95] As described below, Simon eschewed such amendments, ministerial or otherwise, when it acquired Mills' interests a few years later.

From 2003 to 2004 certain KanAm entities "distributed approximately 11 million Mills Units to German investors in the respective KanAm limited partnerships."[96] These distributions presented certain logistical challenges, such as the language barrier between German-speaking investors and Mills as well as redemption and tax compliance challenges.[97] In an attempt to streamline the administrative issues,[98] KanAm and the Mills Partnership executed a services

---

[94] *See* JX0152 §§ 11.6(d), 11.6(f).
[95] Simon's Post-Trial Opening Br. 20.
[96] Pretrial Stip. 10.
[97] *See, e.g.*, Trial Tr. 1004:22–1007:15 (Hammond).
[98] *See id.*

21

agreement on December 1, 2004.[99] Under the services agreement KanAm provided certain administrative functions such as managing cash distributions, redemptions, and tax withholdings on behalf of investors, in exchange for a nominal fee.[100] Additionally, KanAm orchestrated a multi-step process that effectively allowed German investors to redeem Mills Units for Mills stock, a taxable event, and streamlined a rather winding process in order to meet all the regulatory and tax burdens.[101] The redemption process alone required that over nineteen steps be taken on behalf of the investor.[102] KanAm did not have a similar services agreement with Simon during Simon's participation in the JVs.

### 4. Mills Faces Trouble

While KanAm originally held 41.1% ownership in the Mills Partnership at the time of the 1994 IPO of Mills Corp, by March 2004 KanAm's ownership had dropped to 2.17%.[103] In February 2005, Mills Corp disclosed it would "would restate financial results for 2002 through 2004 to correct accounting errors primarily relating to its treatment of equity in earnings from joint ventures, the capitalization of interest and certain other costs, and the timing of gains on sales of partnership interests."[104] Following the February 2005 disclosure, Mills Corp announced in

---

[99] JX0171.
[100] *See id.* at §§ 2, 5.
[101] *See* Trial Tr. 1009:13–1013:3 (Hammond).
[102] *See id.*; JX0162.
[103] Pretrial Stip. 10.
[104] *Id.*

January 2006 that additional accounting problems were uncovered, and that it would restate its financial results from 2000 through 2004.[105] By March 2006, the SEC informed Mills Corp "that it had commenced a formal investigation."[106]

Due to these accounting issues, Mills Corp "never filed its 2005 annual report on Form 10-K or any subsequent annual report, and it never filed a quarterly report after its Form 10-Q for the third quarter of 2005."[107] The failure to file required SEC reports had the additional consequences of preventing Mills Corp from registering its common stock, and preventing holders of Mills Partnership Units from seeking conversion of their units into Mills Corp stock.[108] This development was disclosed to certain KanAm investors by April 2006.[109] Thus, because the units could not convert during this period if the buy/sell provisions were triggered, Mills would not have been able to provide Mills Units that were convertible into publicly-traded stock, a necessary quality of units to exercise the call. In other words, contractually-compliant Mills Units were unavailable for exercise of any call right.

By August 2006, Mills Corp "announced that the accounting errors were expected to reduce stockholders' equity . . . by $296 million and reduce . . . net income for 2003, 2004, and the first three quarters of 2005 by $210 million."[110] The

---

[105] *Id.* at 11.
[106] *Id.*
[107] *Id.*
[108] *See* Trial Tr. 765:16–766:8 (Braithwaite).
[109] *See* JX0220 at 4.
[110] Pretrial Stip. 11.

price of Mills Corp stock declined significantly,[111] almost 75% from February 2005 to January 2007.[112] During this time period it was unclear whether Mills Corp could continue operating as a going concern.[113] Also in August 2006, Mills Corp "announced that its auditor believed that there was 'substantial doubt' that Mills Corp could stay in business because of looming deadlines for repayment of approximately $2 billion in debt."[114]

### 5. Mills Markets Itself

Due to the accounting scandal and the financial difficulty it was facing, Mills announced in February 2006, "that its board had decided to explore strategic alternatives and had retained financial and legal advisors to assist in that process."[115] Mills would sell either the entire company or carve out portions of its assets.[116] In the interim, before any sale occurred, Mills secured a "rescue loan of about $2 billion" from Goldman Sachs, which Mills would likely not have the ability to repay.[117] In addition to obtaining the rescue loan, Mills continued to consider its strategic options.[118] Mills ultimately divested several "problem" assets including the

---

[111] *See* Trial Tr. 764:14–765:3 (Braithwaite).
[112] JX0615 ¶ 49. *See id.* at Ex. 7.
[113] Pretrial Stip. 11. *See* JX0237.
[114] Pretrial Stip. 11.
[115] *Id.*
[116] *See, e.g.*, Trial Tr. 602:5–603:1 (Ordan) (testifying that from Mills' perspective, the "goal of the [strategic] process was to sell the company, either to one buyer or to multiple buyers").
[117] *Id.* at 593:19–594:18 (Ordan).
[118] *See, e.g.*, JX0256.

Meadowlands Project in New Jersey, its international properties, and certain other investments.[119]

KanAm was involved in the sales process of Mills via its directors on the Mills Board along with the advisors KanAm retained. KanAm retained its own financial advisor, and also considered selling its interests in the JVs.[120] KanAm's advisors spoke directly with certain potential purchasers, including Simon.[121] Ultimately, the three KanAm representatives on the Mills Corp board, Messrs. Braithwaite, von Boetticher, and von Perfall, were asked to recuse themselves from the Mills sales process due to alleged conflicts of interest.[122] The KanAm representatives resisted the request.[123] KanAm's representatives on Mills' board did step out of the room when they believed it appropriate, and abstained from voting on the ultimate transaction, however they remained involved in the strategic process.[124]

Early in the sales process, in April 2006, Mills Corp, together with Goldman Sachs and J.P. Morgan, assembled a "Descriptive Memorandum" which was transmitted to "a limited number of parties who have expressed an interest in submitting proposals" to enter a deal with Mills Corp.[125] Simon received the

[119] *See* Trial Tr. 436:14–437:1 (Sokolov).
[120] *See id.* at 767:12–768:3 (Braithwaite).
[121] *See id.* at 894:11–896:2 (Braithwaite).
[122] JX0222 at 3.
[123] *See* JX0226. *See also* Trial Tr. 590:7–592:15 (Ordan).
[124] *See* Trial Tr. 615:4–17 (Ordan).
[125] *See* JX0293 at 1, 3.

Descriptive Memorandum, and it was circulated by certain Simon employees, including senior legal officers.[126] Under the heading "KanAm joint venture key terms and rights summary," the Memorandum described that the "Put-call rights enable . . . Mills to require KanAm to sell its interests to Mills for cash or partnership units of *Mills LP, the choice of consideration to be made in KanAm's sole discretion* . . . ."[127]

Along with other potential buyers, Mills entered discussions with Brookfield Asset Management Inc. ("Brookfield") regarding a potential purchase.[128] This discussion led to an (ultimately-unconsummated) merger agreement. "Brookfield was not a publicly traded REIT."[129] Because of its entity structure, Brookfield clearly did not have partnership units which would be convertible into publicly tradable stock. Brookfield recognized the specified currency in the buy/sell provisions would not work.[130] Braithwaite, on behalf of KanAm, agreed with Brookfield to negotiate in good faith the means to effectuate the put-call currency were Brookfield to acquire Mills.[131] Even though Braithwaite was on Mills Corp's Board, the agreement to further negotiate that he reached with Brookfield on behalf

---

[126] *See id.*

[127] *Id.* at 88.

[128] Pretrial Stip. 12.

[129] *Id.*

[130] *See* Trial Tr. at 776:7–18 (Braithwaite). I note that Mr. Braithwaite also testified that they "had been questioned by a number of other potential buyers about the subject." *Id.* at 782:9–23 (Braithwaite).

[131] *Id.* at 773:18–776:18 (Braithwaite).

of KanAm was never disclosed to Mills Corp.[132] This is in spite of the fact that Mills and Brookfield had executed a merger agreement.[133] Simon also negotiated to acquire, and ultimately, as described below, did (with a partner) acquire, Mills. Despite this issue of consideration of call right currency having been the subject of a discussion between Braithwaite and Brookfield, it was *not* raised by Braithwaite in his discussions with Simon, allegedly because "Simon chose to have very limited discussions with [KanAm] before the merger."[134] There are no contemporaneous documents from this 2007 sales period by KanAm evincing a specific concern about receiving Simon Units.

Mills Corp's outside counsel, Willkie Farr & Gallagher, recognized that the unavailability of Mills Units could present a challenge for future acquirers trying to exercise a call of KanAm's interest.[135] Mills Corp's outside counsel indicated, in a memorandum to Mills, that "[o]f note, the joint venture agreements *strictly call for the OP Units to be those of* [*the Mills Partnership*], and do not contain language authorizing the use of similar OP-type securities in the event [the Mills Partnership] no longer issues Units or ceases to exist as the result of a Mills corporate restructuring or corporate-level transaction."[136] Mills Corp's outside counsel

---

[132] *Id.* at 777:13–778:23 (Braithwaite).
[133] *See id.*
[134] *Id.* at 778:6–780:20 (Braithwaite).
[135] JX0193 at 2; JX0241 at 3–4.
[136] JX0241 at 4 (emphasis added).

recognized the risk that KanAm may insist that it must receive the Mills Units it bargained for, and thus the call right would be frustrated.[137] Mills' counsel presented alternatives to deal with this situation. One was to make Mills' successors agree that they may not exercise the call due to the unavailability of Mills Units, "however, deletion of this ability to buy-out KanAm presumably will be unattractive to potential buyers and will negatively impact pricing for Mills' interests."[138]

Similarly, Simon's general counsel testified that its due diligence process recognized that Mills and KanAm had deleted references to Simon from the JV Agreements, and had included that the only non-cash consideration for the call was Mills Units.[139] Both the internal legal team at Simon, and its outside counsel were aware that the specified (default) consideration was Mills Units, but the general counsel testified that they were not concerned because KanAm had accepted call provisions which included Simon Units in the past.[140] Simon's general counsel directly discussed the issue with Mr. Simon during due diligence, but Simon decided not to raise and discuss the issue with KanAm at the time.[141]

---

[137] *Id. See* JX0192 at 2.
[138] JX0241 at 4.
[139] Trial Tr. 291:7–292:18 (Barkley).
[140] *Id.* at 292:16–293:7 (Barkley); *id.* at 302:22–306:17 (Barkley) (testifying that "we weren't concerned so much about the legal point because we knew KanAm had accepted a call provision with our units in the past. Our units had not changed.").
[141] *Id*. at 311:16–312:14 (Barkley).

## 6. Simon-Farallon Joint Venture Buys Mills

Mills received several offers from potential acquirers. On January 15, 2007, Farallon Capital Management ("Farallon"), who like Brookfield was not a publicly traded REIT, submitted a proposal for a recapitalization transaction whereby Farallon would buy $499 million in additional Mills Corp shares at $20.00 per share.[142] At the time, Farallon owned 10.9% of Mills Corp's outstanding shares.[143] Shortly thereafter, on January 17, 2007, Mills Corp announced that a merger agreement with Brookfield had been reached "pursuant to which Brookfield would acquire Mills Corp. and the Mills Partnership for cash at a price of $21.00 per share."[144] A joint venture of Simon Corp and Farallon then submitted an unsolicited topping proposal to acquire Mills Corp for $24.00 cash per share.[145] Brookfield countered, but Simon/Farallon ultimately submitted a successful bid of $25.25 per share.[146]

SPG-FCM Ventures LLC (the "Simon-Farallon JV"), a 50/50 joint venture between a Simon Corp subsidiary and certain Farallon funds, executed a merger agreement with Mills Corp on February 16, 2007.[147] A subsidiary of the Simon-Farallon JV merged into the Mills Partnership, with the Mills Partnership being the

---

[142] Pretrial Stip. 12.
[143] *Id.*
[144] *Id.* at 13.
[145] *Id.*
[146] *Id.*
[147] *Id.* at 13–14.

29

surviving entity and the Simon-Farallon JV indirectly owning the Mills Partnership.[148] Mills did not merge into Simon, but, due to the structure of the transaction, following the merger Mills Units convertible into common publicly tradable stock—that is, Mills Units suitable as consideration for a call on KanAm— remained unavailable, as they had been since trading was suspended on Mills Corp's stock.[149] The transaction closed on April 3, 2007.[150] I note that pursuant to the merger agreement, "180 German KanAm investors holding approximately 3.4 million Mills Units were eligible to exchange their Mills Units for either cash or Simon Units" in this transaction.[151] Of these, however, only "[f]ive investors holding approximately 53,000 Mills Units, which represented approximately 1.6 percent of the 3.4 million eligible units, chose to convert to Simon Units."[152] Mills Corp was later dissolved in August 2007.[153] The Mills Corp liquidation had been provided for in the merger deal structure,[154] and Mills Partnership Units convertible into Mill Corp common stock were permanently unavailable, thereafter.

At the time of the transaction with the Simon-Farallon JV, KanAm executives, including Braithwaite, did not voice a concern about the transaction with Simon.[155]

---

[148] *Id.* at 14.
[149] *See, e.g.*, Trial Tr. 832:11–18 (Braithwaite).
[150] Pretrial Stip. 14–15.
[151] *Id.* at 14.
[152] *Id.*
[153] *Id*. at 14–15.
[154] *See* JX0275.
[155] Trial Tr. 781:7–23 (Braithwaite); *id*. at 973:15–19 (Hammond).

Similarly, prior to the Simon-Farallon JV transaction, KanAm insiders, such as Mr. Hammond, were not able to identify any instance of KanAm suggesting to Simon or Farallon the need to amend the buy/sell consideration provisions in the JV Agreements.[156] KanAm did not notify Mills' CEO, Mark Ordan, either; Ordan does not specifically recall the buy/sell consideration being raised by KanAm, but testified that if it were raised he "would have alerted [Mills'] attorneys" and taken it "very seriously" and would have "absolutely" disclosed such information to the SEC.[157] However, as described above, Simon along with its outside counsel, was already aware of the consideration issue. They independently identified the issue and raised it to Mr. Simon. Simon decided not to raise or discuss it with KanAm, however.[158] This is despite the fact that the Simon-Farallon JV Agreement went as far as to address the situation in which either Simon or Farallon sought to exercise call rights in a project against the wishes of the other.[159]

KanAm represented to investors during this time that as a result of the Mills sale "[n]othing has changed either for the economic or the legal situation" of the KanAm funds.[160] KanAm representatives, including Braithwaite, met with Simon to confirm that each side would honor the obligations under the contracts and "live

---

[156] *Id.* at 974:6–14 (Hammond).
[157] *See id.* at 611:20–614:22 (Ordan).
[158] *Id.* at 311:23–312:14 (Barkley).
[159] *See* JX0297 §§ 5.12, 1.6.
[160] JX0311 at 2.

31

by the contracts."[161]   According to Mr. Simon, the Simon-Farallon JV at the time believed that despite the language of the contracts, the call right continued to be viable.[162]   Braithwaite, for his part, testified that KanAm chose not to inform Simon of its understanding that the call right was subject to KanAm's discretion to elect Mills Units, because the lockout periods had not run, and thus the discussion was not yet "ripe."[163]

Between Simon's exit in 2002 until the Simon-Farallon JV's acquisition of Mills in 2007 the Simon Entities were not involved in the joint ventures subject to the present dispute.  The 2007 acquisition, however, caused the Simon-Farallon JV to become counter-parties to KanAm in three of the original JVs which the Simon Entities had invested in with KanAm, and then exited: Grapevine, Concord and Arundel Mills.  Additionally, with the acquisition of Mills, the Simon-Farallon JV became parties to JVs in which Simon had never before had an interest, that is, those developed by Mills and KanAm without Simon's involvement, but acquired by the Simon-Farallon JV as a result of the sale of Mills.  Those projects, at issue here, are Orange City, Katy, and Colorado Mills.  The buy/sell consideration provisions were not renegotiated even though Mills Units meeting the specifications set out in the JV Agreements were no longer available, as all parties were aware.  Similarly, the JV

---

[161] *See* Trial Tr. 795:10–23 (Braithwaite).
[162] *See id.* at 36:22–38:20 (Simon).
[163] *Id*. at 792:9–793:4 (Braithwaite).

Agreements were not updated to reflect, in any way, the unavailability of Mills Units.

### 7. Denver West

In October 2007 the Simon-Farallon JV, following its acquisition of Mills, and a KanAm entity entered into a new JV known as Denver West.[164] Denver West, like the other projects at issue in this litigation, was a retail development project. It was located adjacent to a property covered by a separate JV Agreement at issue here, Colorado Mills. Denver West was the only JV entered between KanAm and Simon *following* the Simon-Farallon JV's acquisition of Mills.[165] Additionally, it was the first new JV entered since Mills Units became unavailable.[166]

The starting point for the negotiations of the Denver West JV Agreement was the Colorado Mills JV Agreement; the Denver West JV Agreement initial drafts were red-lines of the Colorado Mills document.[167] An early draft of the agreement circulated by Simon Senior Staff Attorney, Melissa Breeden, changed various terms of the contract, but kept in place Mills Units as the default buy/sell consideration in the event the call was exercised, despite the fact that compliant Mills Units were unavailable.[168] Breeden later circulated a revised draft of the Denver West

---

[164] Pretrial Stip. 15.  The KanAm participant was KanAm USA XX Limited Partnership.  *Id.*
[165] *See* Trial Tr. 190:2–11 (Barkley).
[166] *Id.*
[167] *See* JX0324.
[168] *See id.* at 53.

agreement and included a comment from Brian Warnock, Simon's Senior Vice President for Acquisitions regarding Section 11.3's buy/sell provision, stating that "Simon and Farallon would like the Buy/Sell Price to be paid in cash only, since upon the dissolution of Mills Corp. payment in [Mills Partnership] units *no longer works*."[169] Thus, Simon initially took the position that the buy/sell consideration should only be paid in cash, and, implicitly, that the consideration prescribed, Mills Units, could not be tendered.[170]

The negotiations continued, involving a number of issues. Eventually, Rick Zeckel, Simon's Vice President of Property Management, intervened due to delays in the negotiation process and reached out to Braithwaite at KanAm on October 2, 2007.[171] Zeckel expressed his opinion that the attorney reviewing the agreement for KanAm was holding up the deal through the "attorney's desire to put his fingerprints on all the documents . . . ."[172] Zeckel also shared his "understanding that [KanAm has] agreed that there is no need to retain the concept of Mills Units in the buy-sell provisions, yet [the KanAm attorney] has insisted this remains."[173] The same day, Braithwaite responded that while "Denver West is a relatively simple transaction[,

---

[169] JX0328 at 1 (emphasis added).
[170] *See id.*
[171] *See* JX0330 at 1–2.
[172] *Id.* at 1.
[173] *Id.*

34

it] has raised some broader issues between Kan[A]m and Simon/Farallon that have not previously been addressed."[174]  Braithwaite continued that he had:

> two or three conversations with Brian Warnock about these issues and we are trying to keep these *much broader and significant issues* from complicating this simpler trans[ac]tion. The Simon attorneys did not seem to understand these issues and drafted the documents in an unacceptable manner.  We are . . . trying to draft documents around these issues in a manner that will be acceptable to both sides that will leave the issues open without compromising either side['s] position.  Therefore it is not as simple as it would initial[ly] seem.[175]

Braithwaite added that "[i]t might be helpful if someone on your side could explain to your attorneys that these are not insignificant issues and that it would be helpful if they could understand what we are trying to achieve for all parties."[176]  The next day, October 3, 2007, Melissa Breeden of Simon circulated a revised draft agreement that again included the reference to Mills Units as the consideration for the buy/sell provision.[177]  KanAm's position was that it wanted the language to track that of other partnership agreements, specifically Colorado Mills.[178]

Due to time pressures and an impending deadline, the parties executed a JV Agreement for Denver West effective as of October 10, 2007, which provided that *cash* would be the *sole currency* for payment of the buy/sell consideration in the

---

[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] JX0333 at 1, 52.
[178] Trial Tr. 800:17–801:11 (Braithwaite).

event the call was triggered.[179] On October 9, 2007, a draft of a "side letter" was circulated by Hammond of KanAm to Warnock of Simon.[180] The side letter was directly targeted at Section 11.3's required buy/sell consideration.[181] This initial draft proposed that KanAm's rights would be the same as they were in the Colorado Mills JV Agreement, which provided for Mills Units as the default consideration.[182] The initial draft side letter indicated that the acquisition of Mills by Simon created "a disagreement as to the form of the non-cash consideration under Section 11.3" including "whether the units are to be units of [the Simon Partnership] instead of units of [the Mills Partnership] . . . ."[183] Additionally, it sought to affirm that KanAm, by entering the Denver West Agreement, would be deemed "not [to have] waived any of its rights or claims as to the form of non-cash consideration under Section 11.3 of any of the Limited Partnership Agreements or the Denver West Agreement."[184] The draft concluded that "[t]he parties hereby agree to engage in good faith negotiations to resolve the disagreement as to the form of non-cash consideration."[185]

---

[179] *See* JX0342 § 11.3(d).
[180] JX0340.
[181] *Id.* at 2–3.
[182] *Id.*
[183] *Id.* at 2.
[184] *Id.* at 2–3.
[185] *Id.* at 3.

The parties continued to revise the side letter, and a revised draft was circulated by Breeden of Simon on October 11, 2007,[186] followed by subsequent negotiations and revisions by KanAm individuals.[187] The final version of the side letter was executed on October 17, 2007, and removed the reference that the parties would "agree to engage in good faith negotiations to resolve the disagreement as to the form of non-cash consideration" which was in the earlier circulated draft.[188] The executed version provided that "*if* the parties agree, or it is later determined, that non-cash consideration may be paid under the payment provision" of the Colorado Mills agreement, then that same consideration would be applied to the Denver West agreement.[189] In other words, the parties identified the non-cash consideration issue, negotiated over it, but ultimately avoided reaching a resolution of it in entering the Denver West JV. They punted.

As discussed further in the extrinsic evidence analysis section below, the parties heavily disputed at trial the meaning and relevance of the Denver West negotiations and the side letter, along with certain non-contractual statements made by KanAm representatives to investors.

---

[186] *See* JX0344.
[187] *See* JX0345.
[188] *Compare* JX0348 *with* JX0340.
[189] JX0348 at 5 (emphasis added).

### 8. Grapevine Mills

A refinancing was required in the Grapevine Mills project, a JV at issue here, in 2008. In connection with that refinancing Breeden of Simon prepared and had circulated a draft of an amendment to the Grapevine Mills JV.[190] Simon's September 9, 2008 draft amendment deleted references to Mills Units in the buy/sell provisions.[191] Breeden indicated that Simon's position was "[w]e want to have all cash here as well" like in Denver West.[192] The parties successfully amended the Grapevine Mills agreement in light of the refinancing, but the buy/sell consideration of Mills Units was not changed.[193] There appears to be no documentary evidence at the time of the Grapevine refinancing and amendment that Simon offered to, or sought to, change the non-cash consideration in Grapevine to Simon Units.[194]

### 9. Simon-Farallon Break-up

In March of 2012, Simon acquired Farallon's interests in the Mills Partnership.[195] Following the transactions, the JV "interests that were previously directly or indirectly owned by the Mills Partnership were indirectly owned by

---

[190] *See* JX0366.
[191] *See id.* at 66–70.
[192] JX0367.
[193] *See* JX0369.
[194] *See, e.g.*, Trial Tr. 258:1–20 (Barkley). I note one potential difficulty Simon faced at the time with agreeing to provide Simon Units is that they were involved in these properties with KanAm in conjunction with their JV Partner, Farallon, who could not clearly offer units with the characteristics of Mills Units. *See id.* 258:21–263:1 (Barkley); *id.* at 38:17–39:9 (Simon).
[195] *See* JX0440.

Simon Partnership."[196]   In connection with the acquisition, Simon and KanAm executed the "Agreement and Indemnity."[197]   The Agreement and Indemnity (the "2012 Agreement") was initially presented to KanAm by Mr. Barkley, Simon's General Counsel, with the representation that "[t]here would be no changes required to existing venture agreements at property level companies . . . ."[198]

Shortly thereafter the parties executed the 2012 Agreement.[199]   The 2012 Agreement affirmed that Simon had stepped into the shoes of the Mills Partnership together with all rights the Mills Partnership had.[200]   The Agreement also confirmed that it "shall not be construed as a modification of such organizational documents, nor be construed to diminish, enlarge or in any way affect such rights, if any, which . . . shall remain in full force and effect in accordance with their terms."[201]   Once again, the parties failed to raise the issue of call consideration during the 2012 Agreement negotiations—that is, KanAm did not affirmatively disclose its position that despite Simon stepping into the shoes of Mills Partnership, Simon would not be able to exercise the call provision due to the unavailability of contractually-compliant Mills Units.[202]   Simon, for its part, recognized that the 2012 Agreement

---

[196] Pretrial Stip. 16.
[197] *Id.*
[198] JX0430 at 1; Trial Tr. 216:4–23 (Barkley); *id.* at 225:1–5 (Barkley).
[199] JX0450.
[200] *See id.* at §§ 1(b), 1(d).  *See also* Trial Tr. 210:13–211:7 (Barkley).
[201] JX0450 § 1(d).
[202] Trial Tr. 211:8–20 (Barkley).

did not change any of the rights or obligations that the Mills Partnership owed KanAm.[203] Similarly, prior to the commencement of this litigation, Simon admits that it did not discuss with KanAm its position, advanced in this litigation, that an intended purpose or effect of the 2012 Agreement was to modify the buy/sell currency in the JV Agreements or permit the substitution of Simon Units.[204]

*C. Simon Triggers the Call*

In April 2012 Braithwaite and Hammond of KanAm visited Simon's headquarters to meet with several high-level Simon officials.[205] At the April meeting, the possibility of Simon exercising its call right in certain JVs at issue in this litigation was raised.[206] KanAm purportedly was "surprised" by this discussion, but did not inform Simon at that time of its view that KanAm could thwart Simon's ability to consummate the call by the election of Mills Units.[207]

Pursuant to the buy/sell provisions of the JV Agreements there was a ten-day buy/sell notice period which would open on May 1, 2012.[208] The parties negotiated and executed two letter agreements extending the window for 2012.[209] The first agreement executed on May 3, 2012, extended the start of the ten day period until

---

[203] *See, e.g., id.* at 220:16–221:21 (Barkley).
[204] *See, e.g.,* JX0684 at Resp. Nos. 2, 3.
[205] *See* Trial Tr. 40:21–41:15 (Simon); Pretrial Stip. 16.
[206] *See* Trial Tr. 813:6–814:16 (Braithwaite).
[207] *See id.* at 990:11–991:4 (Hammond).
[208] *See* JX0456 at 1.
[209] *Id.*; JX0462.

June 1, 2012 and the second agreement dated June 4, 2012 extended the ten-day window until June 19, 2012.[210] During these initial extension negotiations, KanAm did not raise its ability to defeat the call provisions by electing Mills Units.[211] Simon ultimately agreed to not trigger the buy/sell provisions in 2012.[212]

The record reflects that on June 21, 2012, Braithwaite of KanAm sent von Perfall and other KanAm principals a legal memorandum, prepared by KanAm's litigation counsel, regarding the put/call consideration issue.[213] A later memo distributed internally at KanAm on June 27, 2012, from KanAm's litigation counsel indicates that Simon "must offer us Mills Units and that they cannot substitute" Simon Units.[214] The remaining substance of these memoranda was redacted to protect attorney-client privilege.[215]

On June 27, 2012, Braithwaite circulated an email to Simon, which advised Simon that, in exercising the call, it "is required to deliver" Mills Units in accordance with the JV Agreements.[216] Braithwaite opined in the email that KanAm "does not believe that Simon can perform such obligation and deliver the specified and required" Mills Units.[217] Braithwaite communicated KanAm's willingness to

---

[210] JX0456 at 1; JX0462 at 1–2.
[211] *See* Trial Tr. 45:2–7 (Simon).
[212] *Id.* at 45:8–14 (Simon).
[213] *See* JX0469 at 1.
[214] JX0470.
[215] *See* JX0469; JX0470.
[216] JX0471 at 1.
[217] *Id.*

negotiate with Simon acceptable non-cash consideration; Simon indicated that it would get back to KanAm regarding renegotiation.[218] It appears this was the first documented notice from KanAm to Simon that it was taking this position regarding the contractual language.[219] During the time this disclosure was made by Braithwaite, the parties were attempting to negotiate a letter agreement to resolve several administrative disputes arising under the JVs.[220] Part of the consideration for the executed letter agreement in late June was that Simon would not trigger the buy/sell provisions that year.[221] In delivering the executed copy of the June 28, 2012 letter agreement, KanAm indicated in its cover letter that the buy/sell consideration issues had not been resolved.[222]

Later that year, in October 2012, KanAm and Simon amended the Concord Mills JV Agreement.[223] This amendment did not change the buy/sell consideration under Section 11.3 of the JV Agreement.[224] Additionally, the amendment ratified and affirmed all the pre-existing agreements except as modified—thus it ratified and affirmed the unchanged consideration portion of Section 11.3.[225]

---

[218] *See* Trial Tr. 834:15–23 (Braithwaite).
[219] *See id.* at 822:3–824:3 (Braithwaite).
[220] *See* JX0474.
[221] *See id.* at 5.
[222] *See id.* at 2.
[223] JX0488.
[224] *See id.*; Trial Tr. 346:21–347:11 (Barkley).
[225] *See* JX0488 at ¶ 40; Trial Tr. 346:21–347:11 (Barkley).

In 2013, Braithwaite of KanAm again communicated with Simon, this time directly to Mr. Simon at an in-person meeting on April 15, 2013, regarding KanAm's willingness to negotiate non-cash consideration.[226] Similarly, Braithwaite sent a follow-up letter to Mr. Simon reflecting the same position.[227] This April 16, 2013 letter states that KanAm had a "long history, familiarity and special relationship" with Mills and that Mills Units were "a material reason" that KanAm entered the JV Agreements and agreed to the put/call consideration.[228] The letter concluded that KanAm remained open to negotiate amendments to the put/call consideration.[229] Mr. Simon indicated that he would follow up, but after two extensions rather than negotiating, Simon initiated this action.[230] The same day this action was filed, Simon sent notices that it was triggering the call for four of the JVs on May 2, 2013.[231] KanAm in response insisted on the specified default consideration, Mills Units, and refused to close.[232] In 2014, Simon sent KanAm notices with respect to the three remaining JVs at issue here.[233] KanAm again insisted on Mills Units and declined

---

[226] Trial Tr. 835:7–836:10 (Braithwaite).
[227] JX0500.
[228] *Id.* at 1.
[229] *Id.* at 2.
[230] Trial Tr. 835:7–836:10 (Braithwaite).
[231] JX0504; JX0508.
[232] JX0811.
[233] *See* JX0557; JX0558; JX0559.

to close.[234]  The pleadings were amended to add these three additional JVs to the present action.

## II. PROCEDURAL HISTORY

Simon initiated this action on May 3, 2013.  Shortly thereafter, KanAm moved for judgment on the pleadings.  Significant motion practice ensued, which is discussed elsewhere.  The parties subsequently cross-moved for summary judgment on March 28, 2014.  Those motions were then briefed and, following oral argument, I denied both motions by Memorandum Opinion of September 30, 2014 for reasons I briefly revisit in the analysis section below.  This first period of litigation involved only four JVs for which notice was given in 2013—Orange City Mills, Arundel Mills, Grapevine Mills, and Concord Mills.

Following the summary judgment decision, the Plaintiffs filed a Second Amended Complaint (the "Amended Complaint").[235]  The Amended Complaint added three additional JVs—Katy Mills, Colorado Mills, and Denver West—for which Simon attempted to exercise its call rights on in May 2014.  The Amended Complaint pleads four counts.  First, through Count I, the Plaintiffs seek declaratory judgments on a number of issues regarding the JV Agreements and the Defendants purported breaches.  Second, through Count II, the Plaintiffs assert a breach of

---

[234] JX0813.
[235] *See* Dkt. No. 119.

contract claim alleging that by failing to close on the transactions after Simon provided notice and offered Simon Units, KanAm breached the JV Agreements. Next, through Count III, the Plaintiffs assert a claim that KanAm breached the implied covenant of good faith and fair dealing through its conduct in refusing to accept Simon Units and insisting on delivery of the call consideration in Mills Units. Finally, Count IV seeks specific performance of the applicable JV Agreements. Along with the remedy of specific performance, the Plaintiffs seek damages for the Defendants alleged breaches including the purported improper distributions paid to the Defendants after the call was triggered. Additionally, the Plaintiffs seek costs, expenses and attorneys' fees pursuant to the JV Agreements, along with an award of interest.

The Defendants, through their Supplemental Verified Counterclaim (the "Counterclaim") assert two counts.[236] Count I asserts a breach of contract by Simon for triggering the call with knowledge that the default consideration was not available, and that by failing to provide valid buy/sell notices Simon breached the JV Agreements. Count II seeks a declaratory judgment that the required consideration in the applicable JV Agreements is Mills Units, and that Simon cannot force KanAm to accept Simon Units. KanAm seeks damages arising from Simon's

---

[236] *See* Dkt. No. 110.

alleged breaches, litigation costs including attorneys' fees pursuant to the JV Agreements, and interest.

I tried this matter over seven days, with the first five days occurring on May 16 through May 20, 2016, and the remaining two days on August 16, and August 17, 2016. The parties engaged in post-trial briefing, and a post-trial oral argument was held on December 16, 2016. What follows is my analysis of the merits of the parties' claims in light of the proof shown at trial.

### III. ANALYSIS

Several issues remain to be decided in this post-trial decision. This is a contract action. Therefore, the threshold inquiry is what are the terms of the applicable contracts—the parties' JV Agreements? Specifically, what are the terms of the buy/sell provisions?

These terms have previously been reviewed in this case. When ruling on the parties' cross-motions for summary judgment I found that:

> [t]he JV Agreements *unambiguously provide* that the default consideration when exercising the call is Mills Units meeting certain criteria. However, these Agreements do not address the unavailability of Mills Units due to a change in control or restructuring transaction. Accordingly, I cannot conclude from this *unambiguous language* whether the parties intended the call right to lapse if and when Mills Units satisfying the contractual criteria became unavailable. Instead, I must resort to extrinsic evidence to determine how the parties intended to proceed in the circumstances in which they now find themselves.[237]

---

[237] *Simon I*, 2014 WL 4840443, at *14 (citations omitted).

I denied summary judgment because there was some evidence in the record that KanAm considered Simon Units as contractually-compliant. Thus, I was not able to "conclude that the Defendants intended only to accept Mills Units, and, accordingly, that the call right was meant to lapse when those Units became unavailable."[238] I found that this, and other issues raised by the parties' cross-motions for summary judgment "require[d] further factual development to ascertain the parties' intent."[239] I explained that "where the contract does not address the matter in dispute, the Court may resort to extrinsic evidence to ascertain the parties' intent, such as the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry."[240] Similarly, the summary judgment decision in this matter left open Simon's claim for breach of the implied covenant of good faith and fair dealing for further factual development.[241]

The parties have created a full record at trial. The determinative question here is whether there was ever a meeting of the minds between the parties about whether Simon Units were a contractual substitute for Mills Units in the present circumstances.

---

[238] *Id.*

[239] *Id.* Those other issues included, at the time, whether KanAm demonstrated a contractual indifference to the type of units it would receive, whether there was a special relationship between KanAm and Mills such that Mills Units are unique and whether Mills and Simon Units are materially different in terms of tax treatment and other risks. *See id.*

[240] *Id.* at *15 (internal quotations omitted).

[241] *Id.* at *14.

This Memorandum Opinion first reviews the relevant extrinsic evidence in an attempt to derive the parties' intent and determine whether there was a meeting of the minds regarding the unavailability of Mills Units. Next, I examine the arguments raised under the substantial performance doctrine before turning to the equitable issues raised by the parties. Finally, I address KanAm's Counterclaims and the appropriate relief under the circumstances present here.

*A. The Contractually Required Buy/Sell Consideration*

1. General Principles

I first examine the general legal principles applicable here. Plaintiffs (and, with respect to the Counterclaim, Defendants/Counterclaim Plaintiffs) bear the burden of proof, to demonstrate entitlement to relief by a preponderance of the evidence.[242] Thus, "Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence."[243] "Proof by a preponderance of the evidence means proof that something is more likely than not."[244] The burden with respect to the remedy of

---

[242] *See, e.g., In re Mobilactive Media, LLC*, 2013 WL 297950, at *9 (Del. Ch. Jan. 25, 2013).
[243] *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016) (citation omitted).
[244] *Id.* (citation omitted).

specific performance of a contract is that a plaintiff must make a showing by clear and convincing evidence.[245]

Delaware follows the objective theory of contracts. "Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent: the words found in the written instrument."[246] Therefore, "[a] contract's express terms provide the starting point in approaching a contract dispute."[247] Further, Delaware law requires that contracts are to be read as a whole.[248]

I have already determined that the JVs unambiguously provide that Mills Units—defined as Units of Mills Partnership with certain characteristics—are the contractually required default consideration.[249] However, where a contract is silent on an issue, such as what was to happen upon the unavailability of Mills Units, the Court "may resort to extrinsic evidence to ascertain the parties' intent."[250] Even when reviewing extrinsic evidence, the text remains important. This Court will

---

[245] *See In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 52 (Del. Ch. 2001) (observing Delaware law "requires that a plaintiff demonstrate its entitlement to specific performance by clear and convincing evidence").

[246] *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (citations omitted).

[247] *Ostroff v. Quality Servs. Labs., Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007).

[248] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions.") (quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[249] *Simon I*, 2014 WL 4840443, at *14.

[250] *Id.* at *15 (citing *Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *41 (Del. Ch. May 13, 2013)).

enforce contracts to effectuate the intent of the parties as demonstrated through the text, that is, "the introduction of extrinsic, parol evidence does not alter or deviate from Delaware's adherence to the objective theory of contracts."[251]  When reviewing the extrinsic evidence submitted, it should be reconciled, to the extent possible, with the text of the contract.  Generally, the parties' undisclosed and private views of a contract's meaning "are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common."[252]  Similarly, when "considering extrinsic evidence, the Court should uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting."[253]  Further, "[i]n giving effect to the parties' intentions, it is generally accepted that the parties' conduct before any controversy has arisen is given great weight."[254]

Where there is an ambiguity or contractual silence on an issue the Court will examine the extrinsic evidence presented by the parties "which may include statements and conduct of the parties, business circumstances surrounding the execution of the contract, any course of dealing between the parties, and any usage

---

[251] *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (citation omitted).
[252] *Id.* (citations omitted).
[253] *Shareholder Representative Services LLC v. Gilead Sciences, Inc., et al.*, 2017 WL 1015621, at *16 (Del. Ch. Mar. 15, 2017) (internal quotations omitted).
[254] *Ostroff*, 2007 WL 121404, at *11 (internal quotations omitted).

of trade or industry custom."[255] Finally, the Court should, "where possible, avoid an interpretation that would render any provision illusory or meaningless."[256]

### 2. The Parties' Contentions

Simon's position, based on the evidence developed at trial, is that evidence extrinsic to the JV Agreements demonstrates that by "Mills Units" the contracts really mean "Mills Units or similar, including Simon Units." Further, Simon argues that its ability to call KanAm's interest is a "fundamental right" that the parties did not intend to lapse.[257] Simon observes that qualifying Mills Units became unavailable due to Mills' own financial difficulties,[258] and questions why KanAm waited five years to "first communicate its current position."[259] Simon argues that "KanAm's interpretation effectively nullifies Simon's call right, a result no party to the JV Agreements intended."[260] Further, Simon argues that there is no evidence that the call right, and buy/sell provisions which are a "fundamental aspect of the JV Agreements," were intended to "simply lapse if Mills Units became unavailable."[261]

KanAm relies heavily on the plain and unambiguous provisions in the JVs specifying that Mill Units meeting certain requirements are the default currency.

---

[255] *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *6 (Del. Ch. Oct. 23, 2002) (citations omitted).
[256] *Id.* (citations omitted).
[257] Simon's Post-Trial Opening Br. 55.
[258] *Id*. at 57 n.20.
[259] *Id.* at 61.
[260] *Id.* at 62.
[261] *Id.* at 63.

51

KanAm attempts to focus the scope of extrinsic evidence by pointing to the "operative JV Agreements" and pointing out that only one of such "operative" agreements ever included a reference to Simon Units.[262] KanAm officials have testified that their position is that Simon could exercise the call right but could not "consummate the transaction" if KanAm chooses to receive Mills Units.[263] That is, it is KanAm's position that the call right has not entirely lapsed; their position, however, leads to the conclusion that the "call right" is no right, but only an opportunity to seek KanAm's agreement to sell its interest for cash. KanAm contends that the parties are free to renegotiate the applicable buy/sell consideration, and that the sole reason there has been no agreement as to "substitute non-cash consideration [is] because Simon refused to address the issue."[264]

Ultimately, KanAm asserts that the factual record developed at trial demonstrates that "these sophisticated parties never mutually agreed to substitute Simon Units for Mills Units."[265] For the reasons below, I agree.

### 3. The Extrinsic Evidence

I now turn to an examination of the most relevant extrinsic evidence presented by the parties. I find it helpful to group the extrinsic evidence presented in this

---

[262] *See* KanAm's Post-Trial Sur Reply Br. 8–11.
[263] *See* Trial Tr. 822:3–19 (Braithwaite).
[264] KanAm's Post-Trial Sur Reply Br. 2 (emphasis removed).
[265] *Id.* at 6.

litigation into four general time periods: first, the 1990's and the initial agreements; second, the events surrounding Simon's exit in 2002; third, the events surrounding Mills' financial trouble and Simon's return via its JV with Farallon in 2007; and finally Farallon's exit from the JV in 2012. Each will be reviewed in turn. When reviewed as a whole the extrinsic evidence shows that the Plaintiffs have failed to establish by a preponderance of the evidence that the parties mutually agreed to the substitution of Simon Units for Mills Units—that is, they have failed to show there was ever a meeting of the minds.[266]

### a. The 1990's through 2002

As discussed in the factual background section, Ontario Mills, while not at issue in this litigation, was the original template for certain of the JV Agreements at issue here, including the original three JV Agreements where Simon and KanAm were counter-parties: Arundel Mills, Concord Mills, and Grapevine Mills. Additionally, three other JVs at issue in this litigation were formed during this period between Mills and KanAm, in which Simon did not participate: Orange City Mills in 1996, Katy Mills in 1998 and Colorado Mills in 2001.[267]

---

[266] While certain portions of the record are analyzed in more detail below, I also rely in this determination on the factual background that I have laid out previously in this Memorandum Opinion.

[267] I note Simon admits the buy/sell provision in the agreements governing these three JV Agreements generally mirror those in Grapevine, Arundel and Concord Mills and only reference Mills Units. *See, e.g.*, Simon's Post-Trial Presentation Slide 36. *See also* JX0041 § 11.3(d); JX0050 § 11.3(d); JX0089 § 11.3(d).

KanAm initially entered the Ontario Mills agreement with Mills as a counter-party; when Simon was later added to the Ontario Mills JV, the JV Agreement was amended to reflect that circumstance.[268] The amendment revised the buy/sell consideration section to provide that the default consideration was to be two-thirds Mills Units, and one-third Simon Units in the event the call was exercised.[269] Additionally, the amendment added the description that such an exchange of units was intended to be tax free under Section 721. The reason for the amendment to the buy/sell consideration to include Simon Units was made clear by trial testimony: Simon Units were required consideration in order for the Section 721 tax deferral feature to function.[270] Braithwaite and Hammond, KanAm's principal negotiators, testified that at the time of these negotiations the only real tax concern about receiving Simon Units was to ensure that the transaction "would get the same sort of tax deferral."[271] Nonetheless, the fact of the amendment demonstrates that, at this stage at least, the parties did not intend the term "Mills Units" to mean "partnership units similar to Mills, including Simon Units."

While the Ontario Mills JV Agreement contained a fixed percentage of Simon to Mills Units as the call consideration, the subsequent agreements in Concord Mills,

---

[268] *See* JX0025.
[269] *See id.* at § 11.3(d).
[270] Trial Tr. 945:19–946:14 (Hammond). *See id.* at 693:7–694:8 (Braithwaite).
[271] *Id.* at 949:9–18 (Hammond). *See id.* at 679:13–23 (Braithwaite).

Grapevine Mills, and Arundel Mills provided that unit consideration would be paid "ratably in proportion to the ownership interests."[272] The three agreements at issue during this time period, however, did draw certain distinctions between Simon and Mills Units, including the extra requirement that contractually-compliant Simon Units must "have the most favorable rights (including redemption, conversion, registration and anti-dilution protection) . . ." of any units of Simon.[273] However, KanAm negotiators do not recall expressing any particular concern about receiving Simon Units at that time.[274] Similarly, no convincing evidence exists about why the "most favorable rights" provision was inserted only for Simon Units and not for Mills Units. In other words, the inclusion of the most favorable rights provision for Simon Units only indicates that the parties considered that Simon and Mills Units were not necessarily equivalent, but does not explain why. The evidence also shows that KanAm was willing to take solely the "best" Simon Units if Simon bought out Mills.

Simon makes much of the fact that KanAm, at the time, impliedly agreed to potentially accept *only* Simon Units; if Simon had bought out Mills, Simon Units would have been the operative consideration. Additionally, Simon points to prospectuses distributed by KanAm to investors during this time that either do not

---

[272] *See* JX0027 § 11.3(d); JX0058 § 11.3(d); JX0074 § 11.3(d).
[273] *See, e.g.*, JX0027 §§ 11.3(d), (f).
[274] *See* Trial Tr. 694:11–14 (Braithwaite).

mention the buy/sell currency at all,[275] or, when they do so, do not draw a particular distinction between Simon and Mills Units.[276] KanAm asserts that any early evidence of relative contractual indifference towards Simon Units is less relevant as it was at the "infancy" of the REIT industry.[277] Similarly, KanAm observes that the contracts themselves show KanAm took care to specify only certain units of Simon or Mills with specific qualities "would pass muster."[278]

I find that the parties' course of conduct and other extrinsic evidence from this period is largely unpersuasive. Simon has shown that there was, early on and at a general level, contractual indifference by KanAm to receiving either Simon or Mills Units. However, KanAm has also shown that when it agreed to accept Simon Units during this time period, the parties modified the contracts to expressly so state, and to provide what qualities the Simon Units had to have, including the most favorable rights provisions. That is, the record from this period does not support the idea that KanAm agreed to automatic substitution of any successor operating partner units, or that the parties meant "Mills Units or similar" when they specified Mills Units.

[275] *See* JX0031; JX0037.
[276] *See* JX0060 at 31; JX0070 at 44.
[277] KanAm's Post-Trial Answering Br. 30.
[278] KanAm's Post-Trial Sur Reply Br. 14.

b. Simon's 2002 Exit and the Subsequent Amendments

As discussed in the factual background section, in 2002 Simon exited three JVs at issue here, Grapevine Mills, Concord Mills and Arundel Mills, after it reached an impasse with Mills. These were the only KanAm/Mills JVs in which Simon had an interest at the time. The exit was achieved via a "shotgun" exit mechanism. When Simon triggered the exit, it was not contractually clear who would remain in the JVs—that is, Simon named the price at which it would either buys Mills out *or* sell its interest to Mills, at Mills' option.[279]

In the interim, before it became clear who would remain in the JVs, Braithwaite of KanAm sent Simon's CEO, David Simon, a letter on March 4, 2002, to inquire about the buy/sell consideration in the Ontario Mills JV Agreement.[280] Braithwaite indicated KanAm "would be interested in *discussing* with [Simon] how Section 11.3 of the Ontario Mills Agreement *might* be implemented if there has been a buy/sell between Mills and Simon of your interests in Ontario Mills, L.L.C."[281] The Ontario Mills agreement, unlike the other JVs actually at issue here, provided for a fixed consideration ratio of one-third Simon Units and two-thirds Mills Units upon exercise of the call. David Simon responded on March 5, 2002, stating that following the exit of Simon or Mills, KanAm's right under the Ontario Mills

---

[279] *See* Trial Tr. 387:18–388:11 (Foxworthy).
[280] *See* JX0099.
[281] *Id.* at 2 (emphasis added).

agreement was to receive the appropriate units "of whichever of Mills or Simon [remained] partner."[282]  Neither Braithwaite nor anyone else at KanAm responded to Simon's explanation of what Section 11.3 would mean for Ontario Mills following the shotgun buy/sell, nor was there further discussion.[283]

KanAm argues it did not respond because the issue, to Braithwaite's mind, was mooted shortly after the letter exchange when he learned that Mills' management had recommended Mills acquire Simon's interests.[284]  KanAm also points out that, had the parties had a pre-existing understanding that Simon Units would be automatically substituted for Mills Units, Braithwaite's letter to Simon would have been unnecessary, and the question would never have been asked.[285]  Simon points to the exchange regarding Ontario Mills, and KanAm's silence in response to Mr. Simon's assertion that Simon Units would serve as currency, as strong evidence that KanAm was indifferent to the units it received so long as they provided for non-recognition tax treatment.[286]  I find this exchange less helpful than Simon does with respect to showing a meeting of the minds regarding the present issues before me.  First, Ontario Mills features a unique JV Agreement, with a fixed exchange ratio not at issue in the JV Agreements here.  I note that, with respect to

---

[282] JX0100 at 1.
[283] *See* Trial Tr. 23:20–24:13 (Simon).
[284] *See* JX0101; Trial Tr. 735:16–737:18 (Braithwaite).
[285] *See* KanAm's Post-Trial Sur Reply Br. 16.
[286] *See* Simon's Post-Trial Opening Br. 59.

the JV Agreements in issue, all references to Simon Units were subsequently removed, as discussed below. Second, with respect to Simon's argument that KanAm's silence—in response to Simon's written assertion that Simon Units would substitute for Mills Units—connotes KanAm's agreement with or indifference to the assertion, I am unpersuaded. The record tends to support KanAm's mootness point—that no response was necessary in light of Braithwaite's awareness that Mills would acquire Simon's interest.

Instructive to the issue before me—whether there was a meeting of the minds regarding the effect of the unavailability of Mills Units—is what happened once Simon *exited* the JVs. Mills and KanAm amended the governing documents to remove references to Simon.[287] On May 31, 2002, the Ontario Mills JV Agreement, a project not at issue here, and the Grapevine Mills JV Agreement were amended to delete references to Simon.[288] Similarly, later in 2002, KanAm and Mills formed a new partnership for Concord Mills.[289] The Concord Mills JV Agreement, thereafter, only makes reference to Mills Units, and provides that they are the default consideration except if KanAm elected to receive cash or a mix of cash and units.[290] The Arundel Mills JV Agreement underwent similar changes: first, the JV

---

[287] *See, e.g.*, JX0111 § 9(f).
[288] *See* JX0108 §§ 2(e), 10; JX0109 §§ 2(e), 13.
[289] *See* JX0120.
[290] *Compare* JX0120 §§ 11.3(d), 11.3(f) *with* JX0058 §§ 11.3(d), 11.3(f).

Agreement was amended to remove references to Simon,[291] second a new partnership document was executed for Arundel Mills in August 2004, and as with Concord Mills, explicitly provided that Mills Units were the default buy/sell consideration, and contained no reference to Simon Units.[292]

In sum, Simon was written out of all JV Agreements to which they were previously counter-parties to KanAm, either through deletion of references to Simon, or by new partnership agreements which do not provide for Simon Units. The default consideration for each JV became Mills Units meeting certain specifications. Unsurprisingly, Simon and KanAm disagree as to the significance of these amendments. Simon admits Mills and KanAm acted to delete references to it from the JV Agreements during this time period but asserts that the amendments were simply "ministerial."[293] Simon further argues that "there is no evidence in the record regarding the amendments to the JV Agreements in 2002 other than that they occurred" and that "KanAm is not entitled to a post-trial inference that these amendments were intended to do anything more than remove references to Simon to reflect its recent exit from the JVs."[294] KanAm's view, as stated through the testimony of Braithwaite, is that the amendments took the issue of Simon Units as

---

[291] *See* JX0106 §§ 2(e), 15.
[292] *See* JX0152 §§ 11.6(d), 11.6(f).
[293] Simon's Post-Trial Opening Br. 19–20.
[294] Simon's Post-Trial Reply Br. 13.

consideration off "the table."[295]  Further, Braithwaite testified that the amendments

reflect a decision post-2002 to not accept Simon Units.[296]  Similarly, KanAm asserts

the amendments and restated JV Agreements were not ministerial changes as they

evince a conscious choice to *limit* the appropriate consideration to Mills Units

meeting certain qualifications—that is, they address (in KanAm's view) an

"essential element" of the contract and "they reflect in the clearest way possible that

Mills and KanAm intended to limit the non-cash consideration to Mills Units."[297]

I find that the record tends to support KanAm's position regarding the post-

2002 amendments, though not to the extent KanAm contends.  To the extent those

contractual revisions shed light on the meaning of "Mills Units" as the default

contractual consideration, and whether there was a meeting of the minds to accept

alternative consideration, the amendments tend to show the unambiguous language

means exactly what it says—Mills Units meeting specified requirements are the

proper consideration.  To the extent these rather stale events are persuasive regarding

the JV Agreements in question, they indicate that KanAm thought it important to

denote what units could evoke its obligations in the event of a call.  I note, in support

---

[295] Trial Tr. 758:20–759:13 (Braithwaite).

[296] *See id.* at 758:11–19 (Braithwaite) ("QUESTION: Okay.  But there was no feeling internally at KanAm that we would no longer accept Simon units post-2002? ANSWER: There certainly was that decision as it applied to these partnerships [Ontario, Arundel, Concord, and Grapevine Mills]. And since it didn't exist in any other circumstance, we didn't think about it.  It wasn't something we spent a lot of time thinking about because it wasn't a real-world circumstance.").

[297] KanAm's Post-Trial Answering Br. 34.

of this interpretation of the evidence, that in 2006, in negotiating an unrelated project, *Mills* requested that KanAm amend the buy/sell provision to allow for units of any future UPREIT operating partner to substitute for Mills Units, a request which KanAm declined.[298]

### c. Simon's 2007 Return

Following Mills' financial struggles, the Simon-Farallon JV acquired Mills. Simon, through its JV with Farallon, returned to the three projects at issue discussed above. The parties failed to renegotiate or alter the buy/sell consideration provisions to account for Simon-Farallon's entry, and Mills' exit. Thus, there are three JVs at issue here—Grapevine, Concord, and Arundel Mills—for which Simon Units were (1) identified as tender for the call right and (2) then removed by amendment as tender in favor solely of Mills Units when Simon exited. Those JVs, however, retained Mills Units as tender when Mills dissolved and Simon, with Farallon, became the counterparty. The Simon-Farallon JV's acquisition of Mills also included three JVs at issue here to which Simon was not an original party,[299] that is, the projects which Simon declined to invest in originally—Colorado, Katy, and Orange City Mills. The buy/sell consideration provisions in these agreements also

---

[298] *See* Trial Tr. 770:16–772:1 (Braithwaite); JX0206 at 18 (proposing revisions to Section 11.3 of the Meadowlands agreement to state that Mills' successor so long as it was structured as an UPREIT, with publicly traded stock "may deliver its operating partnership units or other available securities instead of TMLP Units as consideration . . .").

[299] *See* JX0170; JX0122; JX0155.

called for Mills Units and were not revised despite the entry of the Simon-Farallon JV—there was silence regarding this issue. While there is no smoking gun demonstrating why such changes were not made, common sense, commercial realities, and experience tends to support that such a negotiation of these provisions could have been costly, time consuming, and uncertain—therefore, the parties consciously decided to avoid it. If the alterations were merely "ministerial" as Simon argues the 2002 deletions were, they could have been performed by a stroke of a pen with no negotiation necessary; if this is true it is hard to understand why the alterations failed to occur. I find the former proposition—that both parties made strategic decisions to avoid the issue—more plausible.

The parties point to additional facts from this period as persuasive. Simon points to Braithwaite's negotiations with an alternative potential acquirer, Brookfield, as evidence that KanAm was content accepting Simon Units.[300] In support of this argument Simon observes that Braithwaite affirmatively reached out to Brookfield, an entity with which Mills reached a merger agreement before the Simon-Farallon JV submitted a topping bid, and agreed to negotiate the issue of successor consideration for the call right. Braithwaite admits to reaching an "agreement in principle" on behalf of KanAm to negotiate in good faith with

---

[300] *See* Simon's Post-Trial Reply Br. 15–16.

63

Brookfield on this issue.[301] Simon argues the reason for this negotiation was clear: Brookfield, due to its entity structure (not an UPREIT), could not offer partnership units in a tax-deferred way.[302] According to Simon, KanAm's failure to reach out to Simon in a similar way is telling. To me, nothing about KanAm's willingness to *negotiate* with Brookfield indicates an *indifference* to the consideration it would receive, however. Next, in an appeal to equity, Simon points to KanAm's then-silence about what it now maintains was its position—that only Mills Units, and not successor units, would evoke the call right—and Simon asserts that the "multi-billion dollar transaction was priced" on the basis that the purchaser had an operative call right.[303]

Braithwaite and KanAm were not the only parties with knowledge who were silent, however. Mills' outside counsel, Willkie Farr & Gallagher, produced a memorandum during this time period which indicated:

> [o]f note, the joint venture agreements *strictly call for the OP Units to be those of* [*the Mills Partnership*], and do not contain language authorizing the use of similar OP-type securities in the event [the Mills Partnership] no longer issues Units or ceases to exist as the result of a Mills corporate restructuring or corporate-level transaction.[304]

---

[301] *See* Trial Tr. 775:10–776:18 (Braithwaite).
[302] *See* Simon's Post-Trial Reply Br. 15–16.
[303] *Id.* at 15.
[304] JX0241 at 4 (emphasis added).

Despite the plain language of the contract which resulted in this analysis, Mills did not raise the issue directly with Simon. However, a Descriptive Memorandum created by Mills, together with Goldman Sachs and J.P. Morgan and distributed to potential acquirers (including Simon), provided that the "Put-call rights enable . . . Mills to require KanAm to sell its interests to Mills for cash or partnership units of Mills LP, *the choice of consideration to be made in KanAm's sole discretion . . . .*"[305]

Importantly, *Simon's* general counsel also recognized that the JV Agreements did not refer to Simon Units, and provided that the only non-cash consideration was Mills Units.[306] The internal legal team at Simon, and its outside counsel, knew that the specified default consideration was Mills Units. Simon's current explanation for why it chose to proceed without resolution of this issue is, to me, unsatisfying; Simon's general counsel, Mr. Barkley, testified that Simon was not concerned, because KanAm had agreed to accept Simon Units in the past.[307] If true, this was unwise. I also note that Barkley directly discussed the issue with Mr. Simon during the due diligence process surrounding the Simon-Farallon JV, but Simon still decided not to raise and discuss the issue with KanAm at the time.[308] In short, it appears each legal eye which read these contracts identified the issue. The decision

---

[305] JX0293 at 1, 88 (emphasis added).
[306] Trial Tr. 291:7–292:18 (Barkley).
[307] *Id.* at 292:16–293:7 (Barkley); *id.* at 302:22–306:17 (Barkley).
[308] *Id.* at 311:16–312:14 (Barkley).

to leave the issue open by all involved appears strategic and does not support a finding of a meeting of the minds regarding an automatic substitution of Simon Units.

The negotiation surrounding the Denver West JV Agreement, the only agreement executed *following* Simon's re-entry, is instructive. Simon initially insisted that the buy/sell consideration be paid only in cash.[309] A senior staff attorney at Simon, Breeden, circulated an email with comments that cash needed to be paid since "payment in [Mills] units no longer works."[310] This comment appears to have originated from Brian Warnock, Simon's Senior Vice President for Acquisitions.[311] Thus, at this time it is clear that there was no widespread or absolute understanding within Simon itself that a reference to Mills Units in a JV Agreement's buy/sell provision actually meant Simon Units. During the discussion of the JV, KanAm continued to negotiate the terms and seek some form of non-cash consideration, until Rick Zeckel, Simon's Vice President of Property Management, expressed his frustration with delays over the negotiations regarding the buy/sell provisions.[312] Braithwaite responded that these negotiations raised "much broader and significant issues" that the parties were trying to avoid for the "simpler" deal that Denver West

---

[309] Simon also initially took this position in 2008 during the Grapevine Mills refinancing.
[310] JX0328 at 1.
[311] *See id.*
[312] JX0330 at 1–2.

represented.[313] Due to time pressures the Denver West agreement was signed with cash as the only currency.

However, the parties ultimately executed a unifying side letter qualifying the cash currency. The executed side letter provides that "*if the parties agree, or it is later determined*" that non-cash consideration would be payable with respect to an existing JV, Colorado Mills, then that same non-cash consideration would apply to Denver West.[314] Prior to execution of the side letter, several drafts were circulated. Early KanAm drafts included the following language: "a disagreement as to the form of the non-cash consideration under Section 11.3" exists including "whether the Units are to be units of [the Simon Partnership] instead of units of [the Mills Partnership] . . . ."[315] Further, the draft provided that by entering the Denver West Agreement KanAm "has not waived any of its rights or claims as to the form of non-cash consideration under Section 11.3 of any of the Limited Partnership Agreements . . . ."[316] Finally, the draft stated that "[t]he parties hereby agree to engage in good faith negotiations to resolve the disagreement as to the form of non-cash consideration."[317] The executed side letter, however, removed the reference that the

---

[313] *Id.* at 1.
[314] JX0348 at 5. The parties do not dispute that this language simply means that if non-cash consideration is payable in Colorado Mills, then that same non-cash consideration applies to Denver West. *See, e.g.*, Simon's Post-Trial Opening Br. 33–34.
[315] JX0340 at 2.
[316] *Id.* at 2–3.
[317] *Id.* at 3.

parties would "agree to engage in good faith negotiations to resolve the disagreement as to the form of non-cash consideration" which was in the earlier circulated draft and, as set forth above, pegged the issue to resolution of the same issue in the Colorado Mills JV.[318]

The reference in the final side letter to the consideration in the Colorado Mills JV is telling, and the Denver West negotiations indicate strongly that there was not a definitive agreement or common understanding reached between Simon and KanAm regarding a substitute for Mills Units as non-cash consideration.[319] As I noted in the summary judgment opinion in this matter, the side letter suggests that further negotiations were contemplated.[320] There would be nothing to later "agree" upon or "later determine" if the parties understood at that time that the units called for under the Colorado Mills agreement, to which the side letter was pegged, and which, like all of the other JVs here provided for Mills Units, simply meant "successor units" or "units similar to Mills Units." Further supporting the absence of a meeting of the minds during this period, as Simon's General Counsel testified,

---

[318] *Compare* JX0348 at 5 *with* JX0340. *See* JX0170.

[319] *See* Trial Tr. 909:18–910:19 (Braithwaite). It is difficult to see what non-cash consideration KanAm would be seeking at this time other than Simon Units. It is an irony of this case that in this negotiation KanAm appears to have sought a modification to let it elect Simon Units, while Simon sought to modify the call right to specify cash. If in fact KanAm was seeking Simon Units, I find it nonetheless unhelpful to Simon. Simon declined to *agree* to provide Simon Units, rather leaving the issue open by entering a side letter pegged to non-existent Mills Units.

[320] *Simon I,* 2014 WL 4840443, at *16–17.

68

there are *no* internal Simon communications indicating that Simon would provide its units to KanAm if it exercised a call right under the JV Agreements.[321]

I next briefly address the non-contractual statements by KanAm during this time period to investors and in audited financial statements, upon which Simon relies in an attempt to show the parties intended and understood that Simon Units were automatically substituted as consideration. Simon points to an October 9, 2007, meeting in Dusseldorf, Germany (the "Dusseldorf Meeting") where according to Simon, KanAm communicated to certain investors and sales people that Simon Units were the required non-cash currency following Mills' exit.[322] The deposition testimony of three investors and sales partners at the Dusseldorf Meeting supports Simon's assertion.[323] Each alleges that Mr. von Boetticher, a KanAm principal and former Mills board member, informed those at the Dusseldorf Meeting, essentially, that there would be no changes to the exit mechanisms and that Simon Units would be substituted.[324] At trial, Mr. von Boetticher did not recall making such statements to investors or any specifics of the meeting itself.[325]

---

[321] Trial Tr. 258:12–258:20 (Barkley) ("QUESTION: And isn't it the case, sir, as we've talked about in your deposition, that you cannot identify a single internal memorandum or e-mail at Simon where Simon people said to each other during this period of time, from 2007 through and including 2012, 'Simon units will be provided to KanAm under the joint venture agreements'? ANSWER: I don't recall there being anything like that, yes."); *id.* at 285:2–9 (Barkley).

[322] *See* Simon's Post-Trial Opening Br. 36–39.

[323] *See id.* (quoting depositions of Norbert Geisen, Reiner Michael Cramer, Jeorg Dudel).

[324] *See id.*

[325] *See* Trial Tr. 532:8–536:8 (von Boetticher).

69

Next, Simon points to communications between Juergen Goebel, a KanAm employee, and a KanAm investor, Albert Hoeller.[326] Hoeller contacted Goebel and inquired about the procedure for liquidation in the future in light of Simon's entry.[327] Goebel replied via email explaining, essentially, that nothing had changed, and that if the buy/sell provisions were triggered "the countervalue [would] be paid out in cash or in the form of Simon units."[328] Simon argues this email is strong contemporaneous evidence of KanAm's understanding of the buy/sell provisions.[329]

Additionally, Simon points to KanAm's audited financial statements following Simon's return,[330] which indicated that there was no impact on the KanAm partnership and that the JV Agreements "under certain conditions may require the sale of [KanAm's] interests."[331] KanAm made similar disclosures for several years, from 2008 through 2012, before later updating the financial statements.[332] KanAm asserts that the above language simply reflects that Simon could still exercise the call but KanAm retained the discretion to select units, and that it was simply a "conservative position about what might be 'required.'"[333]

---

[326] *See* Simon's Post-Trial Opening Br. 40–41 (citing JX0352).
[327] *See* JX0352 at 3.
[328] *Id.* at 1.
[329] *See* Simon's Post-Trial Opening Br. 60 (citing JX0352); Simon's Post-Trial Reply Br. 21 (arguing "[t]he information conveyed in Mr. Goebel's email reflected KanAm's contemporaneous understanding").
[330] *See* Simon's Post-Trial Reply Br. 21–22.
[331] *See, e.g.*, JX0392 at 8–9.
[332] *See, e.g.*, JX0370; JX0392; JX0399; JX0419; JX0467; JX0521 at 13.
[333] *See* KanAm's Post-Trial Sur Reply Br. 30.

The evidence Simon has put forward regarding the Dusseldorf Meeting, the Goebel email, and KanAm's financial filings is some evidence that KanAm expected that Simon could successfully call based on a tender of Simon Units. It does create conflict in the record about whether it was mutually understood that Simon Units were a viable tender in place of Mills Units. KanAm has asserted that these are "random comments gleaned from non-contractual documents" and that "[t]he contracts, at all times, spoke for themselves and should be enforced as written."[334] While "random comments" is an overstatement, the references are not so widespread within KanAm as to convince me that KanAm had a corporate understanding that Simon Units were acceptable tender, in light of the other evidence cited above. Importantly, as KanAm observes, this information does not present a course of dealing between two contractual parties,[335] and there is no evidence in the record that this information was relied on by Simon. Rather, during this time period, there were no internal communications at Simon reflecting their understanding that Simon Units were appropriate,[336] let alone a reliance on the above statements. I find that when viewed as a whole the extrinsic evidence during this time period, in light of the unambiguous contractual terms, is insufficient to demonstrate that there was a

---

[334] KanAm's Post-Trial Answering Br. 6.

[335] *See* KanAm's Post-Trial Sur Reply Br. 27–28 (quoting Restatement (Second) of Contracts, § 223(1) "[a] course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct").

[336] *See, e.g.*, Trial Tr. 258:12–258:20 (Barkley); *id.* at 285:2–9 (Barkley).

mutual intent, or meeting of the minds, between KanAm and Simon regarding the automatic substitution of Simon Units.

### d. Farallon's Exit and Simon's Attempt to Call

Following Simon's break up with Farallon, the 2012 Agreement and Indemnity was reached between KanAm and Simon. Simon points to the 2012 Agreement as supportive of its position that Simon Units were substituted as the appropriate buy/sell consideration despite the language of the contracts.[337] KanAm points out this agreement arose when Simon asked for KanAm's consent regarding its acquisition of Farallon, and in exchange agreed to indemnify KanAm against losses. KanAm observes that there is no mention of the buy/sell provisions in the indemnity agreement nor is there any evidence that the parties intended this agreement to work such a change.[338]

I find the record supports KanAm regarding the 2012 Agreement. First, the Agreement was presented initially to KanAm by Simon's General Counsel, who advised that "[t]here would be no changes required to existing venture agreements at property level companies . . . ."[339] Similarly there is no testimony in the record that the parties understood or intended for such a substantial change to be worked to the buy/sell consideration by the 2012 Agreement. In other words, the 2012

---

[337] *See* Simon's Post-Trial Opening Br. 60–61.
[338] *See* KanAm's Post-Trial Answering Br. 36–37.
[339] JX0430 at 1; Trial Tr. 216:4–23 (Barkley); *id.* 225:1–5 (Barkley).

Agreement preserved existing contract rights, including KanAm's right to insist on a tender of Mills Units. The 2012 Agreement did not create new rights regarding the call.

I next briefly address the circumstances surrounding the agreements under which KanAm agreed to an extension of the buy/sell exercise period, and Simon's eventual attempted call. When Simon first indicated its interest in exercising the call, KanAm did not immediately raise its current position that it could insist on Mills Units, and could thus thwart the call's operation. KanAm did not raise this issue to Simon until *after* it signed two extensions to the buy/sell window in 2012. The call was not triggered that year, and in the fall of 2012 the Concord Mills JV Agreement was amended; however, no change was made to the buy/sell provision. During this period KanAm offered to renegotiate the buy/sell consideration— including at an in-person meeting with Mr. Simon in 2013. Simon declined, and ultimately initiated this suit while triggering the call provisions. I take from these facts that KanAm, like Simon, was unsure of its ability to insist on Mills Units; it does not demonstrate to me that the parties understood that Simon Units were an agreed to substitute, therefore.

e. The Contractual Terms

In sum, the JV Agreements unambiguously provide for Mills Units meeting certain specifications. There is insufficient extrinsic evidence to demonstrate, by a

73

preponderance of the evidence, that Simon and KanAm shared a mutual intent or reached a meeting of the minds that, despite this unambiguous language, Simon Units could satisfy the call right. No doubt, there has been gamesmanship and strategic silence by both sides spanning their long relationship. While Simon Units were initially contractually-compliant in the three original JVs to which KanAm was an original partner with Simon and Mills, those agreements were amended or restated to remove references to Simon Units. The three other JVs to which Simon was not an original investor never mentioned Simon Units. When the Simon-Farallon JV acquired Mills there was contractual silence regarding these provisions. All sides knew consideration for the call was an unresolved issue, but failed to bargain for a substitute tender. Compounding the problem, in the best chance to address and fully settle the issue, Denver West—the only post-Simon-return JV— Simon as well as KanAm punted on the issue. Unfortunately for Simon, I must therefore enforce the Agreements as written. Absent a showing of mutual intent regarding the substitution of Simon Units, I cannot add an additional term to the unambiguous contractual provisions.

Before leaving a discussion on the meaning of the Agreements, I note that one of the JV Agreements at issue here, Orange City, includes what the parties have identified as unique language relating to successor interests and the substitution of

successor units as the proper buy/sell consideration.[340]  Simon was not an initial party

to the Orange City JV,[341] but became a party following its acquisition of Mills.  Like

the other JVs at issue, Orange City provides that the default consideration in the

event of a call is Mills Units meeting certain specifications.[342]   However, the

definition of "Mills" or "TMLP"[343] in this JV Agreement was not like the others.

Specifically, Section 11.2 of the Orange City JV Agreement contains a clause that

defines Mills as follows: "[Mills] (which term, for purposes of this Section 11.2 *and*

*Section 11.3 shall be deemed* to include Mezz II GP LLC and *any other Mills*

*Partners*)."[344]   The JV further defines Mills Partners as follows: "Mills Partner(s):

Collectively, [Mills] and Mezz II GP LLC *and* their respective *Affiliates, successors*

*and/or assigns* who or which *become Partners* in accordance with this

Agreement."[345]   Finally, the buy/sell consideration provision in Section 11.3

provides that: "[i]f [Mills] is the Offeror . . . unless [KanAm] elects to receive cash,

---

[340] *See* Post-Trial Oral Argument Tr. 96–97 (arguing on behalf of KanAm that "the fact that it's in one and not in the others doesn't mean I take it from this one and read it into all the others.  It tells me that they agreed in this one to this provision and affirmatively did not agree in any other agreement to that term. . . . the language that exists in Orange that does not exist in any of the other joint ventures, and Simon never asked to have it included"); Simon's Post-Trial Opening Br. 17 n.9 (identifying the unique language in the Orange City JV Agreement).

[341] *See* JX0155.

[342] *Id.* at §§ 11.3(d), 11.3(f).

[343] The Orange City JV Agreement's short term for The Mills Partnership is "TMLP"—for clarity I have substituted "[Mills]" for "TMLP" when quoting the JV Agreement.

[344] JX0155 § 11.2(a) (emphasis added).

[345] *Id.* at § 1.39 (emphasis added); *id.* at § 1.2 (defining Affiliate, "[w]ith respect to any Person, a Person who, directly or indirectly, controls, is under common control with, or is controlled by, that Person," with control meaning "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person").

the Buy/Sell Price shall be paid in full in [Mills] [U]nits of limited partnership . . . ."[346] Mills Units is not a separately-defined term. In other words, uniquely with respect to the JV Agreements at issue, under this Orange City Agreement, successors of Mills—like Simon—are specifically included in the definition of Mills, and thus "TMLP [Mills] Units" includes units of any successor of Mills (so long as they otherwise possess the requisite characteristics, including liquidity and tax avoidance, required of compliant Mills Units).

Under this contractual language, Simon points out that, as the successor to Mills, and via Section 11.2's modifier of the definition of "[Mills]" for Sections 11.2 and 11.3, its units are eligible to be explicitly contractually-compliant. As a result, Simon attempts to make a universal point; it asserts that, since KanAm appears to have been indifferent to accepting successor operating partnership units in the Orange City Mills JV, it must be indifferent generally, and I should construe all of the JV Agreements consistent with Orange City Mills. I find the opposite. The fact that KanAm and Mills bargained for successor units to be tender in one JV Agreement makes more significant the fact that they omitted the same provision in the other Agreements. Moreover, in another JV negotiation not at issue here, Mills sought a similar provision, which KanAm rejected.[347]

---

[346] *Id.* at § 11.3(d).
[347] *See* Trial Tr. 770:16–772:1 (Braithwaite); JX0206 at 18.

KanAm, for its part, argues that the definition of Mills to include successors "means only that Simon as a successor to [the Mills Partnership] can exercise the rights that [the Mills Partnership] had; it does not change the specified consideration from Mills Units to Simon Units."[348] I disagree. The parties to the Orange City JV could have, but did not, separately define Mills Units. They could have, but did not, provide that, notwithstanding that Mills is defined as Mills and any successors for the purposes of the buy/sell provision, "Mills Units" *excluded* successor units.[349]

I construe the Orange City JV Agreement as follows: Simon as a successor is to be construed as "TMLP" ["Mills"]; and its units, if otherwise contractually-compliant, are effective Mills Units, which are contractual tender for the call for KanAm's interest in this JV. In support of this finding I note the broad modifier to the Mills definition is located directly within the Article of the JV Agreement covering transfers. The only question remaining is whether Simon, once read into the agreement per the definition, can offer compliant units pursuant to Section 11.3(f). Section 11.3(f) provides that: "[a]ny Units received by [KanAm] pursuant

---

[348] KanAm's Post-Trial Answering Br. 56 n.204. *See* Post-Trial Oral Argument Tr. 96 (arguing on behalf of KanAm that "the language doesn't track" to a substitution of Simon Units for Mills Units).

[349] I note that certain other JV Agreements without the broader definition present in Orange City provide in their corresponding payment provisions that "[a]ny TMLP Units received . . . ." rather than the "[a]ny Units received . . . ." language present in the Orange City JV. *Compare* JX0155 § 11.3(f) *with* JX0152 § 11.6(f); JX0170 § 11.3(f). That is, unlike with other JVs, the payment provision in Section 11.3(f) of Orange City omits the direct reference to TMLP Units, indicating that successor units were contemplated.

77

to this Section 11.3 shall have substantially the same rights (including redemption, conversion, registration and anti-dilution protection) as attached to units issued in connection with the formation transactions of [Mills Partnership] and Mills Corp . . . ."[350] The majority of the briefing in this matter did not focus on this narrow issue. The evidence at trial made clear that there are differences, from KanAm's perspective, between Simon and Mills Units. The parties differ as to the materiality of those differences. To be compliant, however, successor units in the Orange City JV need not be identical to any particular Mills Units; they only need to provide substantially the same rights in the four delineated areas.

Simon asserts that both parties agree these narrower requirements are met with respect to Simon Units.[351] While the record as it has been presented tends to support this assertion,[352] in light of the absence of an explicit focus on this issue I will permit the parties to submit supplemental memoranda referencing the record on this issue if a stipulation cannot be reached as to whether compliant successor units have been tendered with respect to the Orange City JV.[353]

---

[350] JX0155 § 11.3(f).

[351] *See* Simon's Post-Trial Reply Br. 33 (asserting that "[t]he parties agree that Simon Units satisfy [the tax deferral] central purpose and are indistinguishable with respect to redemption, conversion, registration, and anti-dilution – the only other characteristics of units identified in the buy/sell provisions").

[352] *See, e.g.*, Trial Tr. 1168:4–1169:15 (Fick); *id.* at 1275:10–1276:1 (Croker).

[353] I note my commentary here is limited *only* to these particular factors.

## B. The Material Breach Doctrine

I next turn to a discussion of the doctrine of material breach. Simon argues that "[e]ven if the Court were to find that the extrinsic evidence does not show that the parties intended for the call right to be operative under the present circumstances, KanAm's effort to escape its obligations independently fails because Simon's willingness to deliver the buy/sell price in cash or Simon Units is not a material breach of the JV Agreements that would excuse KanAm's performance."[354] Simon's argument is perhaps better stated as that it stands ready to substantially perform, and thus I should specifically enforce KanAm's reciprocal obligation to sell. Nonetheless, I will in this discussion refer to Simon's position as one of "non-material breach." KanAm, for its part, asserts that the buy/sell provisions are contractual options to purchase and pursuant to Delaware law are to be strictly construed.[355] Further they assert that specific contractual "default provisions" in the JV Agreements bar the doctrine of substantial performance.[356]

I first note that the call provision operates as an option; Simon has the right to purchase KanAm's interest in each JV at certain contractually-provided times. The price to be paid is pegged to appraised value, and must be paid (absent an election by KanAm to take cash) in the equivalent value of units of the Mills Partnership. In

---

[354] Simon Post-Trial Opening Br. 64.
[355] KanAm's Post-Trial Answering Br. 51–52.
[356] *Id.* at 52–53.

order to trigger its right to purchase, Simon must comply with the conditions set forth in the contract. Specific performance of an option contract requires strict adherence to these conditions. I find Simon's argument that it is not in material breach to be inapposite. Having failed to satisfy the conditions for the call, it cannot enforce the contract, as contractual provisions in option contracts are construed strictly. Moreover, specific contract language reinforces the point—the notice of the call, per the JV Agreements, is voidable absent compliance with the conditions necessary to compel the sale. My reasoning is explained in more detail below.

Simon's argument that it is not in material breach turns on a doctrine designed to prevent a non-material deviation from the requirements of a contract from depriving a party of its expectations thereunder. Stated simply, it is a doctrine to prevent oppression through fortuity. Generally, under Delaware law, a breach will be deemed material if "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."[357] If a breach is not material, performance by the injured party is generally not excused and refusal to perform by the injured party may itself constitute a breach.[358] That is, "a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the

---

[357] *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013) (citations omitted).
[358] *See BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

obligations of the injured party to perform under the contract."[359]  The question of whether a breach is material sufficient to justify non-performance entails a fact-specific weighing analysis.[360]  To determine whether a breach is material, Delaware courts have looked to the factors provided by Section 241 of the Restatement (Second) of Contracts.[361]  The Restatement factors are as follows:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[362]

The parties spent much time at trial on this issue, establishing by evidence the similarities and differences between Mills and Simon Units, which I summarize briefly below.  As stated above, among the prime concerns of KanAm is that the consideration provide tax benefits as well as liquidity for its members.  Simon Units,

---

[359] *Id.* (citations omitted).
[360] *See id.*
[361] *See, e.g., id.*
[362] Restatement (Second) of Contracts § 241 (1981).

I note, do provide liquidity and are congruent, but not identical, with respect to tax consequences and risks.

Both Simon and Mills were structured as umbrella partnership real estate investment trusts ("UPREITS"). This entity structure, for both Simon and Mills, facilitated liquidity and tax benefits. As an UPREIT, Simon could provide limited partnership units of the Simon Partnership (Simon Units) that were redeemable for cash or stock. The assets themselves, the interests in the properties, were held at the partnership level. Upon redemption, the distributed Simon Units could convert into either cash or publicly traded stock of the parent REIT—Simon Corp. This process would generally permit a counterparty in a JV to secure non-recognition tax treatment—that is, generally speaking, an exchange of an interest in a JV for such units is not a taxable event under the United States tax code.[363] Mills' entity structure generally mirrored that of Simon, it offered units of Mills Partnership (Mills Units) that were redeemable and upon redemption could convert into publicly traded shares of Mills Corp.[364] Thus, at a general level the operation and purpose of Mills Units and Simon Units was similar.

---

[363] *See* Trial Tr. 154:5–155:3 (Simon).
[364] *See id.*

Simon and Mills as entities, however, were distinct in terms of size, portfolio composition,[365] and their historical relationship to KanAm. The record supports that KanAm investors had a level of familiarity with Mills which they did not possess with Simon. KanAm contributed assets to Mills at Mills' inception. Historically, KanAm had a large ownership stake in Mills—up to 41% at the time of the original Mills IPO; thus, the record supports a finding that when KanAm bargained to receive Mills Units, it had some reasonable expectation that it could influence the actions of Mills. Additionally, for almost two decades KanAm had three representatives on Mills' Board, which evinces a special ability to monitor and participate in Mills that did not exist with Simon. Mills, as a smaller entity, had a higher proportion of projects that were core to its business and unlikely to be sold, which sales themselves could trigger negative tax consequences.[366] Simon, on the other hand, had a strategy of "aggressively recycling capital" which means they were more likely to exit JV projects, an event which could trigger tax consequences.[367] Further, empirically, when given the chance upon Simon's re-entry, only a small minority of KanAm investors elected to exchange their Mills Units for Simon Units.[368] KanAm asserts

---

[365] I note that the investments were generally in specific projects, however, upon conversion the broader portfolio would be relevant because a particular unit or stock's value would be tied to the broader portfolio.

[366] *See* Trial Tr. 389:14–17 (Foxworthy) (testifying that were Mills to lose certain of the JVs at issue here, it would have been "a terrible infringement of their franchise"); JX0613 at 47.

[367] *See* Trial Tr. 107:8–108:14 (Simon).

[368] *See* Pretrial Stip. 14; Trial Tr. at 1016:23–1018:24 (Hammond).

that its contracts did not reflect an agreement to put its tax and economic destiny in the hands of the larger, and less familiar, Simon Entities. Simon points out, however, that none of this alleged unique relationship was disclosed contemporaneously to KanAm investors when it entered certain JVs that provided for both Mills and Simon Units.[369]

The evidence indicates that payment in Simon Units could result in administrative and tax consequences for KanAm and its investors, beyond those inherent in Mills Units.[370] If so, the injury to KanAm, for the most part, is not calculable *ex ante*, as the tax consequences are in the form of heightened tax risks that would depend on later determinations by regulatory authorities or actions by Simon.[371] For example, German regulators would look to Simon's approximately 600 US based LLCs and apply a multi-factor test to each LLC for "opacity," a finding of which would trigger additional tax consequences.[372] KanAm observes that German tax authorities have already reviewed certain joint tax filings of KanAm and *Mills*, on the other hand, and accepted the classifications of taxation provided.[373]

---

[369] *See* Simon's Post-Trial Reply Br. 34–35. KanAm chalks this up to being a "simple omission" and asserts these "1990s statements do not relate to the operative JV Agreements." KanAm's Post-Trial Sur Reply Br. 38.

[370] I note that there was not a similar services agreement reached between Simon and KanAm, in contrast to the services agreement between KanAm and Mills discussed in the factual background section. *See* Trial Tr. 1018:15–22 (Hammond).

[371] *See generally* JX0614.

[372] *See, e.g.*, Trial Tr. 1358:10–1359:16 (Riha); *id.* at 1366:7–1368:8 (Riha).

[373] *See* JX0614 at 19.

Similarly, KanAm argues that if Simon were to add 6,000 German investors as limited partners further tax risks—arising from potential classification as a publicly-traded-partnership—would be triggered.[374]

In rebuttal, Simon points out that the only relevant tax protection actually contained in the JV Agreements is non-recognition tax treatment pursuant to Section 721, and argues that KanAm's professed current concern about these additional tax risks is litigation-driven.[375] Simon observes that none of the tax risks now raised in litigation were communicated to KanAm investors via the prospectuses issued when Simon was a counter-party, and that KanAm did not bargain for the protections they now seek.[376] Simon also observes that its units provide the requisite liquidity, conversion, and redemption qualities specified in the JV Agreements.

Finally, for the reasons laid out in painful detail in the factual background and extrinsic evidence analysis above, the record is unhelpful to Simon with respect to the equitable considerations under the Restatement analysis. Simon will not be deprived of a *reasonable* expectation of a benefit; the problem of the appropriate call-right tender was known by Simon from the time of the Simon-Farallon JV, and

---

[374] *See* KanAm's Post-Trial Answering Br. 70 (citing JX0613 at 71–80).
[375] *See* Simon's Post-Trial Reply Br. 33 (arguing Simon Units satisfy the tax deferred central purpose and are "indistinguishable" with respect to the other listed characteristics).
[376] *Id.* at 34. Simon also denies that such tax risks are legitimate.

85

it chose to roll the dice rather than negotiate the issue. For similar reasons, KanAm's position is equitably weak.

The foregoing recitation should demonstrate that a determination of the materiality of the difference between Simon and Mills Units, from the point of view of the parties under the factors discussed above, is an issue both fact-intensive and difficult. Here, however, I need not reach a conclusion under the material breach doctrine, as under the terms of the contracts, I find the analysis inapt.[377]

The call right functions as an option. KanAm has contractually agreed to sell its interest in each JV to Simon, at Simon's option, in exchange for a number of Mills Units to be determined by the appraised value of KanAm's interest at the time sold. Regarding option contracts, the treatises indicate that precise compliance with the terms of the option is required before the sale is enforced. The doctrine of non-material breach (or substantial compliance) is generally inapplicable to option contracts because a true forfeiture is not involved—each party retains its original interest—and the one–sided nature of such contracts, if not strictly construed, could allow, in effect, unilateral modification. As Williston on Contracts states:

> [w]hen the optionee decides to exercise its option, it must act unconditionally and according to the terms of the option . . . . Nothing

---

[377] I note, in any event, were I to invoke the doctrine, it is exceedingly difficult for me to see how providing consideration *not* in the form bargained for under the terms of the applicable contracts, between sophisticated parties, would not be a material breach. With respect to the buy/sell provisions, the nature of the consideration is naturally material; it is the gravamen of the agreement.

less than an unconditional and precise acceptance will suffice unless the optionor waives one or more of the terms of the option. . . . Because the option itself affords the offeree protection against the offeror's inconsistent action, the general attitude of the courts is to construe the attempt to accept the terms offered under the option strictly. The problem of a potential forfeiture does not enter into the matter.[378]

The Restatement (Second) of Contracts is similar:

[d]espite equity's dislike of forfeitures, . . . requirements governing the time and manner of exercise of a power of acceptance under an option contract are applied strictly. It is reasoned that any relaxation of terms would substantively extend the option contract to subject one party to greater obligations than he bargained for.[379]

Here, KanAm bargained for Mills Units. To the extent I treat the call right as an option, deviation from the terms of the offer cannot be excused as a non-material breach. Simon argues strenuously that it would be unfair to treat the call right as a simple option. It rightly points out that I must read contracts as a whole, and that the call right is but a bargained-for portion of a larger contract; it argues that it has already performed under the contract and that it will be denied the full benefit of its bargain if the call can only be consummated with non-existent Mills Units. Treating a call right imbedded in a larger contract with other reciprocal obligations as an option is problematic, as Simon points out. The record indicates that the right to buy out counterparties as the projects mature was an important part of the JVs. Simon's

---

[378] 1 WILLISTON ON CONTRACTS § 5:18 (4th ed. 2006) (footnotes omitted).

[379] Restatement (Second) of Contracts § 25, Rpt. Note cmt. d (2008). *See Liberty Prop. Ltd. P'ship v. 25 Massachusetts Ave. Prop. LLC*, 2008 WL 1746974, at *17 n.75 (Del. Ch. Apr. 7, 2008) (quoting *id.*).

contentions would be more persuasive here, however, if a reasonable expectation of Simon was that *Simon Units would be accepted by KanAm*. The record, however, shows that Simon was aware that at least an issue existed with respect to proper consideration, yet elected to proceed with the JVs regardless.

Treatment of the call under these particular JV Agreements as an option—acceptance of which must be strictly construed—finds support in the provisions of the JV Agreements themselves. The contracts at issue require strict compliance with the buy/sell provisions in order to consummate the call. The "default provision," which is contained in each agreement at issue,[380] provides that "if at the time of Closing, either party *fails to perform as required*, then and in such event the non-breaching party *shall have the right to void the Buy/Sell Notice attributable thereto or* to pursue any rights at law or in equity (including without limitation, instituting a suit for specific performance)."[381] As I have already found, the Plaintiffs have failed to show by a preponderance of the evidence that there was a meeting of the minds with respect to Simon Units being contractually-compliant substitute units. Rather, the contracts unambiguously require tender of Mills Units meeting certain

---

[380] *See* JX0027 § 11.3(e)(iv); JX0122 § 11.3(e)(iv); JX0120 § 11.3(e)(iv); JX0152 § 11.6(e)(iv); JX0155 § 11.3(e)(iv); JX0170 § 11.3(e)(iv); JX0342 § 11.3(e)(iv).

[381] JX0152 § 11.6(e)(iv) (emphasis added). I note that while Simon asserts that this section alone is insufficient to void the buy/sell notices absent a showing of material breach, it relies on the second clause of this section in support of its argument that this contractual provision "alone is sufficient" to grant specific performance. *See* Simon's Post-Trial Opening Br. 75; Simon's Post-Trial Reply Br. 47.

specifications. The Plaintiffs are trying to perform the contract by offering non-compliant Simon Units. Simon has therefore failed to perform as required under the JV Agreements, and the bargained-for provision that if "at the time of Closing, either party *fails to perform as required*, then and in such event the non-breaching party *shall have the right to void the Buy/Sell Notice attributable thereto . . .*" has been triggered.[382]

KanAm has a contractual right to void non-compliant notices pursuant to the JV Agreements. Enforcement of the call right under the doctrine of non-material breach would render this bargained-for contractual right surplusage. Stated another way, the non-breaching party always has a right to avoid performance in the event of a material breach. If the contractual right to void the buy/sell notice simply meant KanAm may avoid closing only in the event of a material breach, it would do no actual work in the contract. A fair reading of this provision is that in the event a party fails to comply with the requirements to exercise the buy/sell provision, the non-breaching party can void the notice. I find KanAm's assertion that such a provision was put into these contracts, at least in part, to avoid a "close enough" argument persuasive.

Finally, I pause to briefly address Simon's requested relief. The agreements in question were to conduct joint ventures. The call right gives Simon the right to

---

[382] *See* JX0152 § 11.6(e)(iv) (emphasis added).

buy out its counterparty for a specific consideration at a specific time.  Simon seeks

specific performance of that contractual right to purchase the KanAm interests, with

Simon Units or cash, thereby forcing KanAm out of the JVs.[383]

In order for equity to force KanAm to sell, Simon must demonstrate that it has

complied with the contract and is able to perform.  Delaware courts will specifically

enforce a contract only if the party seeking relief establishes that "(1) a valid,

enforceable, agreement exists between the parties; (2) the party seeking specific

performance was ready, willing, and able to perform under the terms of the

agreement; and (3) a balancing of the equities favors an order of specific

performance."[384]   Further, "[t]he decision as to the availability of specific

performance rests within the sound discretion of this Court."[385]   Additionally,

"specific performance [is] an extraordinary remedy, not to be awarded lightly," and

a "party seeking specific performance must *prove by clear and convincing evidence*

*that she is entitled to specific performance and that she has no adequate remedy at*

*law*."[386]

---

[383] While enforcement of the contract specifically is the primary relief requested, I note that Simon has also pursued damages on the theory that Simon Units are contractually-compliant and that by refusing to accept them and exit the JVs, KanAm breached—it seeks restitution for distributions after the attempted exercise of the call.

[384] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) (citations omitted).

[385] *Id.* (citation omitted).

[386] *Halpin v. Riverstone Nat'l, Inc.*, 2015 WL 854724, at *5 (Del. Ch. Feb. 26, 2015) (citations omitted) (emphasis added).

As detailed above, Simon was *not* capable of performing *under the terms* of the agreements—it failed to provide the contractually required currency.  Further, in light of its knowledge of, but failure to address, the issue of consideration in the JV Agreements, Simon would find difficult its burden to show by clear and convincing evidence that equity would favor specific performance even if I had found that Simon Units were contractually-compliant.

*C. The Implied Covenant of Good Faith and Fair Dealing*

I next turn to Simon's claim arising under Count III of its Complaint, which asserts that KanAm violated the implied covenant of good faith and fair dealing by demanding non-existent Mills Units.  This Court's summary judgment opinion briefly addressed this issue stating that "as the JV Agreements do not address the unavailability of Mills Units, the Plaintiffs' allegation that the Defendants have breached their implied duty of good faith and fair dealing is not precluded by our case law."[387]  I now revisit this issue in light of the fully developed factual record from trial.

As our Supreme Court has explained the implied covenant "is a limited and extraordinary legal remedy."[388]  Generally, "the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which

---

[387] *Simon I*, 2014 WL 4840443, at *14.
[388] *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).

91

has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[389]   The implied covenant, however, is limited to a gap filling role. The "implied covenant of good faith and fair dealing involves . . . inferring contractual terms to handle developments or contractual gaps that . . . neither party anticipated."[390]   However, "[i]t does not apply when the contract addresses the conduct at issue."[391]   In the same vein, "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider . . . ."[392]   Additionally, the covenant is "not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[393]   Finally, "[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[394]

Simon asserts "that KanAm has violated the implied covenant of good faith and fair dealing by attempting to defeat Simon's exercise of the call right by purporting to 'choose' payment in non-existent Mills Units."[395]   Simon argues that

---

[389] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted).

[390] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015) (quoting *Nemec*, 991 A.2d at 1125) (alterations provided by the Supreme Court in *Northpointe Holdings*).

[391] *Id.* (citation omitted).

[392] *Nemec*, 991 A.2d at 1126.

[393] *Id.* at 1128.

[394] *Id.*

[395] Simon's Post-Trial Opening Br. 69.

"KanAm has intentionally frustrated Simon's fundamental rights" to exercise the call by voiding the buy/sell notices arbitrarily and unreasonably.[396] Simon alleges that KanAm's interpretation is "especially unreasonable given KanAm's position that its put right remains fully intact" and that "the parties did not and never would have agreed to such an unfair arrangement had they thought to negotiate with respect to the matter."[397] KanAm counters that there is no gap to be filled here—that the parties expressly were aware that the JV Agreements required tender of Mills Units, and yet there was a decision on both sides to not address a replacement currency.

Simon's position, in my view, is not supported by our law or the facts of this matter. This is not a case where the parties never considered that exercise of an option would be frustrated by an unexpected happenstance. Dispositive, I think, of Simon's claim is the fact that while there was contractual silence on this issue from both sides, the issue was not unknown to the parties—each side independently identified the potential issue, attempts were made to negotiate it, but no agreement was ever reached. That is, the circumstances the parties found themselves in—a call provision that explicitly provides the seller the option to require unavailable units as consideration—was recognized by all, but no agreement was reached. A party, after

---

[396] *Id.*

[397] *Id.* at 70. I note, in light of my findings, which effectively render the call right unenforceable, it remains to be determined whether KanAm's put right remains operative, and whether, in equity, it could enforce such a right. The put and call were obviously negotiated to be reciprocal, and the continued vitality of the put is problematic.

93

consciously avoiding an issue, cannot seek rescue through the implied covenant, and I may not provide through equity what the parties failed knowingly to provide for themselves. Further, nothing in the record supports the implication that the parties would have agreed to the automatic substitution that Simon seeks through the implied covenant. Since I cannot know what resolution the parties would have reached through negotiation, relief via the implied covenant is unavailable.

### D. Waiver/Estoppel

#### 1. Waiver

Simon asserts that KanAm waived any right it had to insist on Mills Units via its words or conduct over the course of several years, during which, according to Simon, KanAm demonstrated an understanding that Simon Units were acceptable non-cash consideration. KanAm observes that Simon was aware of the JV Agreements' terms and that KanAm "had no duty to tell Simon that the contractual Buy/Sell Provisions meant what they say."[398]

It is well-settled that a party may waive her contractual rights; as our Supreme Court has explained, "[w]aiver is the voluntary and intentional relinquishment of a known right."[399] Delaware Courts will find a waiver upon a showing "(1) that there is a requirement or condition capable of being waived, (2) that the waiving party

---

[398] KanAm's Post-Trial Answering Br. 79.
[399] *Realty Growth Inv'rs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982) (citations omitted).

94

knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition."[400] Waiver involves "knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights."[401] The standard for demonstrating waiver is "quite exacting;" because waiver is redolent of forfeiture, "the facts relied upon to demonstrate waiver must be unequivocal."[402]

In support of its waiver claim, Simon points to statements allegedly made at the Dusseldorf Meeting and the Goebel email exchange, as both representing "unequivocal expression of KanAm's intent to waive any right to insist on receiving non-existent Mills Units."[403] Additionally, Simon points to KanAm's dealings with Brookfield, including Braithwaite's undisclosed agreement in principle, to negotiate in good faith the buy/sell consideration, despite his service on the Mills board.[404] Simon asserts that "KanAm had an obligation in good faith to raise" the issue in connection with the Simon-Farallon JV's acquisition of Mills.[405]

---

[400] *Amirsaleh v. Bd. of Trade of City of N.Y.*, 27 A.3d 522, 530 (Del. 2011) (citation omitted).
[401] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citation omitted).
[402] *Amirsaleh*, 27 A.3d at 529 (internal quotations omitted). *See Kallop v. McAllister*, 678 A.2d 526, 532 (Del. 1996) ("Waiver, however, requires more than mere inaction. To substantiate his waiver defense, [the defendant] needed to show that [the plaintiff] intentionally relinquished his right to rely on the Letter Agreement.") (citations omitted).
[403] Simon's Post-Trial Reply Br. 44–45.
[404] Simon's Post-Trial Opening Br. 71.
[405] *Id.* at 72.

95

Simon has failed to demonstrate KanAm's knowing and unequivocal waiver of the right to insist on receiving Mills Units; that is, the facts relied upon in an attempt to prove waiver are *not* unequivocal in nature. While the allegations surrounding the Dusseldorf Meeting and the Goebel email do indicate that certain individuals at KanAm thought it might be compelled to accept Simon Units, they do not demonstrate an intentional and knowing relinquishment of a right. These statements were not made directly to Simon—there were no such communications by KanAm to Simon. However, during the general time period of the Goebel email and Dusseldorf Meeting, in late 2007,[406] the Denver West negotiations occurred where Simon itself refused to provide Simon Units and insisted on cash consideration for the buy/sell agreement. KanAm informed Simon there were broader issues at play arising under the buy/sell provisions awaiting resolution. Similarly, the executed Denver West side-letter was pegged to resolution of an existing dispute, that is, what the parties might later "agree" or "determine" would apply to the Colorado Mills JV Agreement, which itself provided for Mills Units. The Denver West negotiation clearly reveals that the parties were aware that the consideration issue was unsettled and required "agreement," or judicial "determination," and cuts strongly against a clear and unequivocal waiver.

---

[406] The Goebel email exchange occurred in December 2007. JX0352. The Dusseldorf meeting was held on October 9, 2007. *See* Simon's Post-Trial Opening Br. 36. The Denver West side letter was executed on October 17, 2007. JX0348.

Following Denver West, Simon simply points to several years of silence on the issue. This is insufficient to demonstrate waiver. I note that the condition to be waived—payment in Mills Units—would not arise until the buy/sell was triggered, making KanAm's silence on this issue less persuasive. I find Simon has failed to make a sufficient showing of the required elements of waiver.

### 2. Quasi-Estoppel

Simon has also asserted that KanAm is estopped from insisting on the contractually required default consideration.[407] Specifically, Simon argues that the doctrine of quasi-estoppel prevents KanAm from asserting a position "inconsistent with a position it has previously taken."[408] Generally, quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken."[409] Importantly, unlike traditional estoppel, this Court has explained that a "party does not need to show reliance for quasi-estoppel to apply."[410] However, the standard remains high, as our Supreme Court has explained "the doctrine of quasi-estoppel applies *when it would be unconscionable to allow* a person

---

[407] *See* Simon's Post-Trial Opening Br. 73–75; Dkt. No. 115. While the doctrine of equitable estoppel was specifically pled, it was not clearly pursued in post-trial briefing and to the extent it is not deemed waived, the elements have not been proven. Reasonable reliance, an element of equitable estoppel, is lacking under the facts here.

[408] Simon's Post-Trial Opening Br. 73.

[409] *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (internal quotations omitted).

[410] *Barton v. Club Ventures Investments LLC*, 2013 WL 6072249, at *6 (Del. Ch. Nov. 19, 2013) (citation omitted).

to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[411] Further, quasi-estoppel requires a showing that the "party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another."[412]

In support of its quasi-estoppel argument, Simon again points to the Goebel email exchange and the Dusseldorf Meeting.[413] Again, Simon's reliance is not at issue, so the fact that these representations were not made to Simon is of little moment. The record, including the Denver West negotiation, shows, however, that there was a legitimate disagreement at the time, between these parties, regarding non-cash consideration. I decline to find that KanAm's conduct here, via certain statements to investors, rises to the level of unconscionability needed to invoke the doctrine of quasi-estoppel. KanAm, while strategically silent at certain points, has not engaged in a shocking shift in position amounting to unconscionable action; in other words, a decision to stand on the bargained-for language of the contracts does not shock the conscience. I find there is an absence of the type of "self-interested 180 degree turn" which has led to the application of the doctrine in prior cases.[414] Enforcing the contracts as written here would not offend equitable principles.

---

[411] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 872–73 (Del. 2015) (internal quotations omitted) (emphasis added).
[412] *Id.* at 873 (internal quotations omitted).
[413] *See* Simon's Post-Trial Opening Br. 74.
[414] *See Pers. Decisions, Inc.*, 2008 WL 1932404, at *7.

*E. KanAm's Counterclaim*

I now turn to KanAm's Counterclaim.[415]  The Counterclaim alleges breach of contract by Simon for knowingly providing invalid buy/sell notices in breach of the buy/sell provisions of the JV Agreements and seeks a declaratory judgment.[416] KanAm seeks damages arising from this purported breach, including but not limited to the cost of the appraisal process that was triggered following Simon's delivery of the notices.[417]  Finally, in addition to a request for damages, KanAm seeks fees pursuant to the JV Agreements along with pre- and post-judgment interest.[418]  Each remaining aspect of the Counterclaim is briefly addressed below.

### 1. Breach of Contract and Damages

KanAm bears the burden of proving every element of its breach of contract claim, including damages, by a preponderance of the evidence.  KanAm's theory for breach appears to be as follows: the buy/sell notices were defective because Simon could not tender the default consideration, the notices still triggered the mandatory appraisal process, and KanAm incurred the costs of that appraisal process.[419]  But KanAm has not demonstrated breach of the agreement.  KanAm acknowledges that Simon had the right to call, which it did.  A contractual appraisal of KanAm's interest

---

[415] I need not address KanAm's affirmative defenses in light of my findings above.

[416] *See* Dkt. No. 110 ¶¶ 44–54.  I note the timeliness of the Concord Mills notice was not pursued in post-trial briefing.

[417] *See id.* at ¶ 50.

[418] *Id.* at Prayer For Relief; Pretrial Stip. 33.

[419] *See* KanAm's Post Trial Sur Reply Br. 51.

resulted. At that point, KanAm had the option to accept cash or demand Mills Units. It elected the latter. Simon was unable to perform, triggering KanAm's right to void the call. No breach occurred. Similarly, the costs of the appraisal are not "damages" but rather an expense of the JV triggered pursuant to contract.

While this is a legal, not an equitable, claim, I note that KanAm, like Simon, avoided bringing the consideration issue to a head by its strategic silence; it can hardly complain equitably that Simon sought to tender Simon Units.

Finally, the Counterclaim seeks declaratory relief on two remaining points which were litigated to conclusion:[420] first, that the JV Agreements require Simon to pay in Mills Units unless KanAm elects cash, and second, that Simon cannot enforce its call right by tendering Simon Units.[421] In light of my discussion above, and setting aside the Orange City JV, KanAm's request for declaratory relief is granted.

### 2. Fees and Interest

Each side has sought fees in connection with this action pursuant to the fee shifting provisions in the JV Agreements.[422] The fee provision both parties rely on provides "[i]n the event the Partnership or any Partner (or its Affiliates) institutes litigation" which asserts a claim arising out of the JV Agreements or relating to the project, or the partnerships, "the parties hereto agree that the prevailing party in such

---

[420] *See* Dkt. No. 110 at ¶ 54.
[421] *Id.*
[422] *See* Simon's Post Trial Opening Br. 76–77; KanAm's Post Trial Sur Reply Br. 52–53.

litigation or administrative action shall be entitled to recover its out-of-pocket costs and expenses of defending or maintaining such litigation or administrative action, including without limitation, attorneys' fees."[423]

The JV Agreements thus provide a broad fee-shifting provision to a covered party who is successful in litigating issues arising out of the JV Agreements. Both sides assert that the present litigation is covered by the provision.[424] Our Supreme Court has explained that:

> [u]nder the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs. An exception to this rule is found in contract litigation that involves a fee shifting provision. In these cases, a trial judge may award the prevailing party all of the costs it incurred during litigation. Delaware law dictates that, in fee shifting cases, a judge determine whether the fees requested are reasonable.[425]

KanAm, as the prevailing party, is entitled to fees with respect to the bulk of Simon's claims. Simon, in turn, prevailed on the Counterclaim and may yet prevail on the Orange City claim. If, after resolution of the Orange City matter, the parties cannot agree on a fee award, they should so inform me, and I will address the issue.

---

[423] *See* JX0066 § 14.9 (emphasis added). *See also* Simon's Post Trial Opening Br. 77 (citing JX0066 § 14.9). Because the parties have not differentiated the fee provisions in the JV Agreements, I assume they are sufficiently similar to the above cited language by the Plaintiffs.
[424] *See* Simon's Post Trial Opening Br. 76–77; KanAm's Post Trial Sur Reply Br. 52–53.
[425] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007) (citations omitted).

## IV. CONCLUSION

For the reasons set forth above, I find that the Plaintiffs' request to enforce its call right (setting aside the Orange City JV) is denied; that the Defendants' request for declaratory judgment is granted, and that the Counterclaim is otherwise dismissed. The parties should confer and agree on a method to address the outstanding issues regarding the Orange City JV, as well as fees and costs.